643 F.2d 585
 15 ERC 2005, 60 A.L.R.Fed. 342, 11
Envtl. L. Rep. 20,537
 COLUMBIA BASIN LAND PROTECTION ASSOCIATION, etc., et al.,
Plaintiffs-Appellees,
and
South Columbia Basin Irrigation District, Plaintiff-Intervenor,
v.
James R. SCHLESINGER, etc., et al., Defendants-Appellants.
COLUMBIA BASIN LAND PROTECTION ASSOCIATION, etc., et al.,
Plaintiffs-Appellees,
and
South Columbia Basin Irrigation District, Plaintiff-Intervenor,
v.
James R. SCHLESINGER, etc., et al., Defendants-Appellees.
COLUMBIA BASIN LAND PROTECTION ASSOCIATION, etc., et al., Plaintiffs,
and
South Columbia Basin Irrigation District, Plaintiff-Intervenor,
and
State of Washington and Franklin County,
Plaintiffs-Intervenors-Appellants,
v.
James SCHLESIGNER, etc., et al., Defendants-Appellees.
 Nos. 78-1526, 78-1588 and 78-3311.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 1, 1980.
Decided April 20, 1981.
 
 Dale L. Kingman, Thom, Navoni, Mussehl, Hoff, Pierson & Ryder, Seattle, Wash., on brief; Ronda L. Sandquist, Helena, Mont., argued, for Schlesinger.
 C. J. Rabideau, Pasco, Wash., Robert M. Sweeney, Asst. U.S. Atty., Spokane, Wash., Thomas L. Bjorgen, Asst. Atty. Gen., Olympia, Wash., for Columbia Basin Land, et al. and intervenors.
 Appeal from the United States District Court for the Eastern District of Washington.
 Before ELY and NELSON, Circuit Judges, and KARLTON,* District Judge.
 NELSON, Circuit Judge:
 
 
 1
 Appellants (an association of farmers in Franklin County, Washington, hereinafter Landowners) sued the Bonneville Power Administration (BPA), an agency within the Department of the Interior, to enjoin the construction of a 500 kilovolt power transmission line across their lands. The district court denied them the injunction, and the Landowners now bring this appeal. All 191 towers required for the line have been erected and the line has been in operation since 1978.
 
 
 2
 Numerous flaws in the proceedings are alleged by the Landowners. The major issues concern whether the Environmental Impact Statement (EIS) prepared by the BPA on the proposed power line was in conformance with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4335 (1976). We hold that the EIS adequately complied with the provisions of NEPA.
 
 
 3
 Aside from the alleged procedural defects, the Landowners challenge the decision to build along the chosen route as a substantive matter. We hold, however, that the BPA's decision was not arbitrary and capricious but was based on legitimate economic considerations reflected in the EIS.
 
 
 4
 Further, the Landowners claim that the Memoranda of Understanding between the Bureau of Land Management (BLM) and the BPA, and the Bureau of Reclamation (BR) and the BPA should have been the subject of an EIS separate from that made by the BPA for the project as a whole. We reject this argument and hold that a separate EIS for the Memoranda of Understanding is not required under NEPA.
 
 
 5
 The Landowners also raise a number of issues based on the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701-1782 (1976). Under the facts of this case, however, we find that the BLM and the BPA sufficiently fulfilled the obligations of §§ 503 and 505. Therefore, the permit as issued is valid.
 
 
 6
 The Landowners also claim that the BLM should have required a FLPMA right-of-way permit for privately held lands in which the United States has retained mineral rights and over which the power line crosses. We reject this argument and hold that these lands are not subject to FLPMA's right-of-way requirements.
 
 
 7
 Intervenors argue that the FLPMA right-of-way permit issued by the BLM to the BPA obligates the BPA to comply with the substantive standards and the procedures of Washington's Energy Facility Siting Act, and with Franklin County's land use regulations. We hold that the BPA is required to meet the substantive standards of Washington's siting act, but reject the Intervenors' other contentions.
 
 
 8
 Finally, on cross appeal, the Government contends that the district court incorrectly interpreted FLPMA to require the BPA to obtain a right-of-way permit from the BR. We agree. FLPMA's right-of-way provisions apply to "public lands" administered by the BLM and to national forest lands under the jurisdiction of the Secretary of Agriculture, but do not apply to the BR.
 
 
 9
 * STATEMENT OF FACTS
 
 
 10
 Appellant farmers (Landowners) filed suit in 1976 to enjoin the construction of a power line over their lands. The original suit sought to stop construction of the line because the environmental impact statement (EIS) failed to meet the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4335 (1976). The EIS prepared by the Bonneville Power Administration (BPA) discusses five alternate routes for the Lower Monumental-Ashe power line. The route selected (Route D-1) is forty-one miles long, crosses approximately twelve miles of irrigated land and eighteen miles of dryland being farmed. Some of the eighteen miles of dryland are scheduled to be irrigated under development of the Columbia Basin Project. Construction costs were estimated at $14.4 million. The Landowners argue that the power line should have been built along Route E, which is fifty-one miles long and crosses predominately grazing land, one mile of dryland and only two miles of irrigated cropland. Construction costs for this route were estimated at $17.2 million. Landowners' request for a preliminary injunction was denied on the ground that they were unlikely to succeed on the merits of the claim. Columbia Basin Land Protection Association v. Kleppe, 417 F.Supp. 46, 53 (E.D.Wash.1976).
 
 
 11
 The Landowners then amended the complaint to raise additional defects in the administrative process of locating the transmission line and moved for a permanent injunction against further construction. The district court rejected most of their claims on the merits. The court did, however, issue a temporary injunction on the narrow ground that, as to the publicly owned, federally controlled lands over which the power line right-of-way must pass, the BPA was required to obtain permits for rights-of-way from the Bureau of Land Management (BLM) and the Bureau of Reclamation (BR). The district court subsequently dissolved the injunction on the ground that the BPA had obtained the necessary permits from the BLM and the BR. Further efforts by the Landowners and by Intervenors, the State of Washington and Franklin County, to restore the injunction pending appeal were rejected by the district court and by this court. All 191 towers required for the line have been erected and the line has been in operation since 1978.[1]II
 
 ISSUES PRESENTED
 
 12
 A. Was the EIS filed by the BPA concerning the proposed power line construction adequate according to procedures set forth in the National Environmental Policy Act?
 
 
 13
 B. Was the decision of the BPA to build a power line along Route D-1 arbitrary and capricious?
 
 
 14
 C. Did the Memoranda of Understanding between the BPA, the BLM, and the BR require the preparation of a separate EIS?
 
 
 15
 D. Was the permit issued by the BLM to the BPA in conformity with the Federal Land Policy and Management Act of 1976?
 
 
 16
 E. Must the BPA comply with the standards of the Washington State Energy Facility Siting Act and the Franklin County Comprehensive Plan, and receive a certificate from the Governor of Washington?
 
 Issue on Cross Appeal
 
 17
 F. Was the BPA required to obtain a FLPMA right-of-way permit from the BR before proceeding with the transmission line?
 
 III
 DISCUSSION
 A. Adequacy of the EIS
 1. Standard of Review
 
 18
 The purpose of NEPA is to assure that federal agencies are fully aware of the present and future environmental impact of their decisions. Lathan v. Brinegar, 506 F.2d 677, 693 (9th Cir. 1974) (en banc). Additionally, the preparation of an EIS ensures that other officials, Congress, and the public can evaluate the environmental consequences independently. As this court stated in Trout Unlimited v. Morton, 509 F.2d 1276 (9th Cir. 1974):
 
 
 19
 (A)n EIS is in compliance with NEPA when its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information.
 
 
 20
 Id. at 1283. The appropriate standard of review of the adequacy of the EIS, set forth in § 706(2)(D) of the Administrative Procedure Act, is whether the EIS was prepared "without observance of procedure required by law." 5 U.S.C. § 706(2)(D) (1976). See Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 781 (9th Cir. 1980); Trout Unlimited, 509 F.2d at 1282; Lathan, 506 F.2d at 692-93. A court is not to substitute its judgment for that of the agency as to the environmental consequences of its action. Rather, this court's role is to ensure that the agency has taken a "hard look" at environmental consequences. Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976). Moreover, "the test of EIS adequacy is pragmatic and the document will be examined to see if there has been a good faith attempt to identify and to discuss all foreseeable environmental consequences." Warm Springs Dam Task Force v. Gribble, 565 F.2d 549, 552 (9th Cir. 1977) (per curiam). The adequacy of the content of the EIS is determined by a rule of reason, which requires only "(a) reasonably thorough discussion of the significant aspects of the probable environmental consequences." Trout Unlimited, 509 F.2d at 1283. See Westside Property Owners v. Schlesinger, 597 F.2d 1214, 1217 (9th Cir. 1979); County of Suffolk v. Secretary, 562 F.2d 1368, 1375 (2d Cir. 1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). Accord, Matsumoto v. Brinegar, 568 F.2d 1289, 1290-91 (9th Cir. 1978) (EIS was sufficient under NEPA standards even though formal cost-benefit analysis was not made); Life of the Land v. Brinegar, 485 F.2d 460, 469-73 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). This court has said that
 
 
 21
 (r)ather than imposing a per se rule requiring detailed discussion of overall environmental effects, the rule of reason means that the inquiry is whether, and to what degree, discussion of the overall environmental impact of on-going operations is necessary reasonably to set forth sufficient information to enable the decision-maker to consider the environmental factors and to make a reasoned decision.
 
 
 22
 Westside Property Owners, 597 F.2d at 1217.
 
 2. Adequacy of the Cost-Benefit Analysis
 
 23
 Landowners' major complaint is that the EIS failed to include an adequate discussion of the comparative costs and benefits associated with the alternative power line routes. First, we note that each alternative received equivalent treatment. The following information was provided for all five options discussed: a description of location and tower design; the length of the route; the cost; the right-of-way requirements; the access road requirement; the impact on national resources; the impact on cultural and socioeconomic resources; and the impact on significant resources.[2] Thus the EIS discussed the environmental costs and benefits associated with each of the alternative routes in some detail. Even though this information is not presented in a comparative form, it demonstrates that alternatives were explored in the initial decision-making process, and that those persons removed from that process had the opportunity to evaluate the alternatives. See Trout Unlimited, 509 F.2d at 1286.
 
 
 24
 The Landowners cannot, therefore, reasonably complain that Route E was not considered at all by the BPA in its determination of the best route, or that the consideration given Route E was more cursory than that given the proposed route and the other alternatives. Nor do the Landowners argue that the range of alternatives considered in the EIS was inadequate. Rather, they object to the absence of a formal comparison between the various alternatives such that anyone could determine which alternative is best. This objection amounts to two contentions. First, the Landowners argue that the BPA failed to employ a form of cost-benefit analysis known as the PERMITS system. Second, they contend that the EIS did not afford full disclosure of the environmental costs and benefits associated with the project because it failed to include an internal memorandum prepared by the BPA that compared Route E directly with Route D-1.
 
 3. PERMITS System
 
 25
 NEPA contains the basic requirement that all federal agencies shall
 
 
 26
 identify and develop methods and procedures ... which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations.
 
 
 27
 42 U.S.C. § 4332(2)(B)(1976). This language has been interpreted to mandate "a rather finely tuned and 'systematic' balancing analysis in each instance." Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109, 1113 (D.C. Cir. 1971).
 
 
 28
 The law in this Circuit is clear that a formal and mathematically expressed cost-benefit analysis is not always a required part of an EIS. Trout Unlimited, 509 F.2d at 1286; Matsumoto, 568 F.2d at 1290-91. This is not to say that a mathematical cost-benefit analysis is never required. If an alternative mode of EIS evaluation is insufficiently detailed to aid the decision-makers in deciding whether to proceed, or to provide the information the public needs to evaluate the project effectively, then the absence of a numerically expressed cost-benefit analysis may be fatal. See Trout Unlimited, 509 F.2d at 1286. This, however, was not the case.
 
 
 29
 Landowners claim that the BPA possessed the technology to do a sophisticated cost-benefit analysis through a methodology known as PERMITS (Process of Energy Routing Minimizing Impact from Transmission System). The BPA, while acknowledging the existence of PERMITS, argued at the hearing on the preliminary injunction, that it is still in a prototype stage, and that the BPA had not yet accepted it as a preferred methodology. In light of these uncertainties as to the developmental stage and value of PERMITS, we cannot say that the BPA, as a matter of law, should have utilized this system. The district court concluded that NEPA does not require an EIS to contain an "intricate, computerized system of analysis." We agree. An EIS is adequate if it aids the "decision-makers in deciding whether to proceed" and provides "the information the public needs to enable both those who would challenge, and those who would support the project to respond effectively." Trout Unlimited, 509 F.2d at 1286. There may well be circumstances in which these goals cannot be achieved unless a sophisticated, numerically-based cost-benefit analysis is provided. This case does not provide such circumstances, however. First, it is not clear from the record that PERMITS was available to the BPA, and, second, the information contained in the EIS was sufficiently detailed for that document to serve the purposes for which it was designed.
 
 4. Full Disclosure
 
 30
 Landowners also argue that the EIS failed to include an internal memorandum prepared by the BPA that compared Route E directly with Route D-1. One of the purposes of an EIS is to ensure full disclosure of the environmental consequences of a project. Trout Unlimited, 509 F.2d at 1282; Silva v. Lynn, 482 F.2d 1282, 1284-85 (1st Cir. 1973).
 
 
 31
 The omitted memorandum contained two tables. The first compared the six routes under consideration in terms of the following factors: length, parallel existing miles, river crossings, access road mileage, rangeland mileage, agricultural mileage, diagonal mileage, buildings near the right-of-way, Hanaford Reservation mileage, line cost per mile, and line cost total. While we agree that presenting data in tabular form is useful and would have aided the decision-makers' evaluation of the alternatives, practically all of the information contained in this table is within the EIS. The main information given in the table that is not in the EIS is the line cost per mile; however, this figure can be readily obtained by simply dividing the total cost by the number of miles for each route. Because the information contained in the first table is within the EIS, albeit not in tabular form, we conclude that the failure to include the table itself does not constitute non-disclosure of the environmental consequences of the project.
 
 
 32
 The second table that was omitted provided a breakdown of the overall cost figures for Routes E, D, and D-1. This table gave the costs of land, surveying, design, materials, clearing, construction, material handling, and administrative overhead. The total cost figure and the number of miles for each route are the only statistics given in this table that are also in the EIS.
 
 
 33
 The balancing of the environmental costs of a project against its economic and technological benefits is mandated by NEPA. 42 U.S.C. § 4332(2) (B) (1976); Calvert Cliffs' Coordinating Committee, Inc., 449 F.2d at 1113. In this case, the alleged non-disclosure concerns a non-environmental factor that BPA used to justify in part the decision to proceed with Route D-1. We agree that the policy of full disclosure applies equally to the economic and technological benefits of a project as to its environmental costs. If full disclosure were applied only to the environmental costs, the purposes of mandating a balancing analysis would be defeated.
 
 
 34
 But, we must examine the nature of the non-disclosure to determine whether it significantly added to the information available to decision-makers and to the public. This document consisted of a further breakdown of figures given in the EIS. It was not, for example, a study that contained wholly different information, the results of which were reported in a form that would not allow the public to respond or to know the basis of the agency's ultimate conclusion. See, e. g., Coalition for Canyon Preservation, 632 F.2d at 782 & n.3; Trout Unlimited, 509 F.2d at 1284. This was simply a more elaborate presentation of information already contained in the EIS. Obviously, the disclosure policy does not require an agency to include in the EIS all working papers that form the basis of the information presented in the report. An EIS must be a manageable document such that the information it contains or incorporates is in a readily usable form. "(T)he test of EIS adequacy is pragmatic and the document will be examined to see if there has been a good faith attempt to identify and to discuss all foreseeable environmental consequences," Warm Springs Dam Task Force, 565 F.2d at 552, but we will not "fly speck" these documents. Lange v. Brinegar, 625 F.2d 812, 817 (9th Cir. 1980); Lathan, 506 F.2d at 693. There is no suggestion, and we cannot reasonably conclude, that the total cost figures provided in the EIS were distorted by the absence of the cost-breakdown, or that the failure to include this particular information was in bad faith.
 
 
 35
 The crucial figure that agency decision-makers and the public needed to know was the cost of each route. We recognize that the breakdown of that total cost figure provided additional insight into the reasons why one route is more expensive than another, but the EIS in effect provided this same insight in its general discussion of the merits of each route. For instance, agricultural land is likely to be more expensive than non-agricultural land; construction of a longer route is generally more expensive than construction of fewer miles. Thus, we cannot agree that the non-disclosure of the cost-breakdown between Routes D, D-1, and E is sufficient to render the whole EIS inadequate. See Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1026 (9th Cir. 1980) (per curiam); Hoe v. Alexander, 483 F.Supp. 746, 750 (D.Haw.1980).
 
 5. Secondary Impacts
 
 36
 The Landowners assert that the EIS failed to take into account secondary impacts created by the power line construction. These costs include loss of agricultural land and decreased production. We reject this argument. First we note that these costs are essentially primary costs associated directly with the erection of the towers. Without regard to whether the costs are primary or secondary,[3] however, the effect of transmission line construction on agricultural land is considered throughout the EIS. For instance, the EIS states that "the land occupied by towers, substations, and access roads will be unavailable for other uses during the life of the facility; limitations will be placed on land under transmission lines and adjacent to transmission facilities including loss of land for timber and agricultural production," and that "cultivation of most crops can be carried out within a few feet of towers in agricultural fields and land taken out of production is limited to the area occupied by the tower itself."
 
 
 37
 Further, the statement lists the effect the lines might have upon agricultural uses of the land: interference with the present pattern of cultivation; increased potential for equipment damage; reduction in crop yield around the towers; interference with irrigation systems; possible loss of life from contact of the irrigation pipes with the lines when the pipes are raised too high; interference with aerial spraying; and other short-term effects such as loss of production during construction. Thus we cannot agree that the EIS failed to consider adequately the costs created by the loss of agricultural land along Route D-1.
 
 
 38
 B. Was the BPA's Decision to Construct Along Route D-1
 
 
 39
 Arbitrary and Capricious?
 
 
 40
 Aside from the procedural defects discussed above, the Landowners challenge the decision to build along Route D-1 as a substantive matter. The Landowners argue that in deciding to proceed with Route D-1, the BPA ignored conclusions or considerations stated in the EIS, and that the agency decision was therefore unlawful. The substantive review of agency action is governed by the Administrative Procedure Act. A reviewing court will not set aside agency action unless that action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976). Thus we have held that "(t)he substantive decision whether to proceed with a project is committed to the executive and legislative branches of government with which the judiciary will not interfere in the absence of a showing that the choice was 'arbitrary and capricious,' given the known environmental consequences." Warm Springs Dam Task Force, 565 F.2d at 552; see Lathan, 506 F.2d at 692-93. The ultimate standard of review of the agency decision is a narrow one: "(t)he court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).
 
 
 41
 The district court concluded that the BPA's decision was clearly based on legitimate economic considerations reflected in the EIS. We agree. The EIS demonstrates the balancing process done by the BPA. The EIS projected the economic costs of constructing each of the alternative routes. Route D-1 was the cheapest. Furthermore, the EIS discusses, in sufficient detail, the environmental consequences associated with each route. For instance, the EIS discusses the impact on the agricultural environment inherent in the proposed route and the problems associated with Route E, such as the unstable nature of the land and significant negative scenic effects. The choice of Route D-1 after weighing such considerations cannot be characterized as arbitrary and capricious in light of the known environmental consequences set forth in the EIS.
 
 
 42
 C. Did the Memoranda of Understanding between the BPA, the BLM and the BR require preparation of a separate EIS ?
 
 
 43
 The Landowners also claim that certain agreements executed between the BLM and the BPA, and the BR and the BPA should have been the subject of an EIS separate from that made by the BPA for the project as a whole. These agreements, called Memoranda of Understanding (Memoranda[4]), and their supplements provide the agencies with reciprocal crossing rights on the lands under their respective jurisdictions when the rights-of-way are needed for projects of the requesting agency. Each agency also agreed to meet certain conditions pertaining to the planning, construction, use, and maintenance of the transmission facilities. The Memoranda also contain a provision for supplements thereto as additional rights-of-way are requested. The Memorandum between the BR and the BPA was entered into in 1944 and has been supplemented 125 times. The BLM and the BPA Memorandum was entered into in 1967 but no comparable figure is available for the supplements to it.
 
 
 44
 For an EIS to be required under NEPA, the Memoranda must be found to be "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (1976). There has been no suggestion that these are not major federal actions. The question on appeal is whether they also significantly affect the environment. This Court has held that this standard is met whenever the plaintiff has alleged facts which, if true, show that the proposed project may significantly degrade some human environmental factor. City & County of San Francisco v. United States, 615 F.2d 498, 500 (9th Cir. 1980); City of Davis v. Coleman, 521 F.2d 661, 673 (9th Cir. 1975).
 
 
 45
 The district court found that this standard had not been met because the project itself, not the Memoranda, significantly affects the environment. The court reasoned that although it was clear that the Memoranda are federal actions, the Landowners had not alleged or shown how the Memoranda significantly affect the environment in any manner. The court stated that the individual projects for which the rights-of-way are requested probably affect the environment but the agreement to grant the right-of-way itself seemed to have no significant impact on the environment. Therefore, the Landowners were found not to have met the standard outlined in Coleman, and thus the court held that an EIS was not required for the Memoranda, or, on similar reasoning, for the supplements thereto.
 
 
 46
 We affirm the holding of the district court on the grounds that whatever environmental impact the power line project could have, whether from its construction, use, maintenance, or location, was already the subject of the project EIS and that whatever environmental impact could be caused by the granting of a right-of-way pursuant to the project was included in that EIS. Because the right-of-way could have no additional significant impact, a separate EIS for each Memoranda is not required.
 
 
 47
 This case is different from that presented by Environmental Defense Fund, Inc. v. Andrus, 596 F.2d 848 (9th Cir. 1979). That case dealt with the Yellowtail and Boysen Reservoirs located in the Northern Great Plains area of the United States. Water is scarce in that area and the sparse population is predominately involved in farming or ranching. The area does contain rich coal deposits, however, so private petroleum and mining companies applied to purchase options for water from these reservoirs as part of their plans to develop these coal deposits.
 
 
 48
 In 1967, the Secretary of the Interior began an industrial water marketing program. Prior to that time neither reservoir had any water allocated for industrial use. In the next three years pursuant to this plan, the Secretary executed seventeen water supply option contracts committing 658,000 acre feet per year for industrial use. Because of the scarcity of water in the area, industrial use of the water would reduce the benefit to agricultural land by reducing the water available for irrigation. No EIS was prepared for the marketing program as a whole or for any of the individual option contracts.
 
 
 49
 This Court found that an EIS must be prepared for both the project as a whole, and for each individual option contract. Id. at 853. All parties agreed that separate EIS's were necessary, the only argument was to their timing. Id. at 852. This was so because the Secretary had different and individual decisions to make regarding the program and the individual contract applications. He had to decide first, whether to go forward with the program at all, and if so, then he had to look at each individual application to see what, if any, effect the amount of water requested and the use proposed would have on the environment and on the project. The general project would not have included each of the individual applications and thus, each application as granted would have an additional impact on the environment. Therefore, separate EIS's were necessary so that the decision-maker could examine the possible effects on the environment.
 
 
 50
 In the case at bar, by contrast, the BPA had made the decision of where the power line should go. In fact, they applied for the right-of-way only after having prepared an EIS covering the construction, use, maintenance, and location of the power line and after they had established what they considered to be the optimal line, alignment, and location of the towers. To require the BLM and the BR to prepare a new EIS for the right-of-way request would merely make the government duplicate the time and expense already undertaken in analyzing the impact the location of the towers could have on the environment. All of the factors that would be considered in this EIS had been included in the EIS prepared by the BPA and thus there could be no additional significant impact on the environment caused by the granting of a right-of-way pursuant to the BPA decision requiring a separate EIS. Thus, we hold that a separate EIS for the Memoranda of Understanding is not required under NEPA.
 
 
 51
 D. Was the Permit Issued by the BLM to the BPA in Conformity with the Federal Land Policy and Management Act of 1976?
 
 
 52
 Under the mandates of FLPMA, 43 U.S.C. §§ 1701-1782 (1976), whenever a project such as that proposed by the BPA is going to cross land under the jurisdiction of the BLM, the proposing party must obtain a permit from the BLM granting a right-of-way over that land. The BPA applied for and received a permit to cross Ringold Island, an uninhabited island under the jurisdiction of the BLM. The Landowners contend, however, that this permit is void and ask that we direct the district court to require the BLM to prepare a new permit in compliance with FLPMA (the Act).
 
 
 53
 The Landowners raise two separate contentions: (a) that the permit as issued, which considered only Ringold Island, was not issued in compliance with FLPMA; and (b) that the BLM did not take into consideration in issuing the permit those lands in the Columbia Basin Project in which the United States has retained certain mineral rights administered by the BLM. We will address each of these issues in turn.
 
 
 54
 1. Was the permit as issued in compliance with FLPMA?
 
 
 55
 Specifically, the Landowners claim that the permit is void because the BLM did not comply with §§ 503 and 505 of FLPMA. Section 503 deals with right-of-way corridors and reads: "(T)he utilization of rights-of-way in common shall be required to the extent practical .... In designating right-of-way corridors and in determining whether to require that rights-of-way be confined to them, the Secretary concerned shall take into consideration national and State land use policies, environmental quality, economic efficiency ...." 43 U.S.C. § 1763 (1976).
 
 
 56
 The Landowners contend the permit is void under this section because the BLM limited its inquiry solely to the impact the right-of-way would have on Ringold Island. The Landowners point to the fact that a BLM agent who signed the permit testified that although he believed it was the BLM's responsibility under FLPMA to make an investigation of the potential difficulty of not having a right-of-way corridor, the BLM did not make such an investigation.
 
 
 57
 Section 505 specifies terms and conditions that must be met before the permit can be authorized and provides, in pertinent part:
 
 
 58
 Each right-of-way shall contain (a) terms and conditions which will ... (iii) require compliance with applicable air and water quality standards established by or pursuant to applicable Federal or State law; and (iv) require compliance with State standards for public health and safety, (and) environmental protection, ... if those standards are more stringent than applicable Federal standards; and (b) such terms and conditions as the Secretary concerned deems necessary to ... (v) require location of the right-of-way along a route that will cause least damage to the environment, taking into consideration feasibility and other relevant factors ....
 
 
 59
 43 U.S.C. § 1765 (1976).
 
 
 60
 Landowners claim that a number of requirements of § 505 were not met. They claim that the BLM did not investigate or consider federal or state water quality standards, the State of Washington's Environmental Policy Act or other state or county health, safety, or energy acts. They contend that the BLM did not investigate or consider which route for the power line would cause the least damage to the environment. The Landowners state that the reason the BLM did not fully comply with the Act was that Mr. Martin, the officer who processed the application, treated the BPA differently from other applicants in that he relied on the BPA to fulfill some of the requirements of FLPMA.
 
 
 61
 A brief outline of the chronology of pertinent events may help put the facts in proper perspective. FLPMA was enacted in October of 1976. The BLM was given interim guidelines for the processing of right-of-way applications under the Act in a directive of December 14, 1976 (Organic Act Directive No. 76-15 (OAD)). This OAD instructed the BLM to continue to process the applications under certain sections of the Code of Federal Regulations (43 C.F.R. §§ 2800 & 2850) as had been done previously, until the Secretary of the Interior (the Secretary) published new regulations. At this time the BPA was a part of the Department of the Interior (the Department) as was the BLM. The right-of-way application was received by the BLM on April 18, 1977 and was approved on June 17, 1977. On the first of October 1977, just a year after the enactment of FLPMA, the BPA was transferred to the newly created Department of Energy.
 
 
 62
 As is evident, the BLM was processing this application under a new statute, with only interim guidelines for assistance in interpreting it. We agree with the Landowners that the BLM, and Mr. Martin in particular, treated the BPA's application differently than it would have an application from a private individual or an agency not under the jurisdiction of the Department. This he freely admitted. But, this is so because he acted under what he believed was the proper interpretation of FLPMA.[5] FLPMA refers to what the Secretary must see is done before the BLM can grant a right-of-way. The BLM believed that the Secretary could delegate the responsibility for fulfilling the Act to different agencies of the Department, and that some of the responsibility was delegated to the BPA and some to the BLM. The BLM could, therefore, rely on particular determinations made by the BPA, such as the selection of the appropriate route, because the BPA had a procedure for doing this to fulfill its obligations under other federal laws. Thus, the BLM reasoned, as long as the requirements of FLPMA were met by either of these two "sister" agencies, then the Department's responsibility under the Act was met, and a permit could be validly issued.
 
 
 63
 Our first question is whether we accept this interpretation of FLPMA in this case because the BLM did not, on its own, meet all of the requirements of FLPMA.
 
 
 64
 The United States Supreme Court has consistently held that a federal agency's statutory interpretation, while not binding, is to be given great deference by reviewing courts. Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Unemployment Compensation Commission v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946). See Good Samaritan Hospital, Corvallis v. Mathews, 609 F.2d 949, 954 (9th Cir. 1979) ("if an agency's interpretation of a statute or regulation is not clearly outside its authority, then the courts should defer to the agency's expertise"); Baker v. United States, 613 F.2d 224, 226-27 (9th Cir. 1980). This is particularly true when the statute is new. "Moreover, an administrative 'practice has peculiar weight when it involves a contemporaneous construction of a statute by the (persons) charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' " Zenith Radio Corp., 437 U.S. at 450, 98 S.Ct. at 2445 (quoting Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933)). The standard of judicial review is whether the agency interpretation was reasonable. It does not have to be the only reasonable construction or the interpretation that a court would choose if first presented with the question; it only must be a reasonable interpretation. Train v. Natural Resources Defense Council Inc., 421 U.S. 60, 75, 95 S.Ct. 1470, 1479-80, 43 L.Ed.2d 731 (1975); Udall, 380 U.S. at 16, 85 S.Ct. at 801; Unemployment Compensation Commission, 329 U.S. at 153-54, 67 S.Ct. at 250-51.
 
 
 65
 Applying this standard to the case at hand, we find that the interpretation of FLPMA used by the BLM was reasonable under the circumstances. FLPMA had been enacted only approximately six months before the BPA's application. There were only interim guidelines in effect to help the agency process the application. It is not unreasonable for the processing agent to interpret the statute to mean that the Department as a whole should meet the requirements of FLPMA since the Act refers to the Secretary and what he needs to do.
 
 
 66
 This reasoning is strengthened by the fact that neither the parties nor this court has found any cases that would have suggested to the BLM a different interpretation of these particular sections of the Act. FLPMA's legislative history on these sections is also very general and does not address this problem. Moreover, this was the way the BLM had acted prior to FLPMA, and § 310, 43 U.S.C. § 1740 (1976), and the OAD instructed the BLM to continue under old procedures until new guidelines were released.
 
 
 67
 Because we find this interpretation reasonable, we are faced with the question of whether the provisions of FLPMA have been met using this interpretation. Under this interpretation the permit is valid if the provisions of FLPMA have been met by either the BPA or the BLM. We find that they have been sufficiently fulfilled to uphold the right-of-way permit as issued by the BLM.
 
 
 68
 First, we note that this is not a case where the BLM simply signed an application blindly. The BPA applied for the permit only after having completed its EIS and after having determined what it thought was the optimum location, use, maintenance, and construction of the power line. The BLM reviewed the EIS and the BPA's construction specifications, checked the application against the requirements of CFR §§ 2800 and 2850, and did its own investigation of many of the relevant factors. Meetings were held with the BPA and field inspections were done on the island. The BLM then issued a Land Report that outlined its findings and concluded that FLPMA's requirements had been met. In the permit granting the right-of-way, the BLM stipulated ten conditions to the grant designed to further mitigate any possible environmental damages.[6]
 
 
 69
 Contrary to the Landowners' allegations, the BLM did recognize the existence of federal, state, and county laws. The report recognized state and local programs such as state zoning ordinances and found that this project did not conflict with existing zoning. The BLM reviewed federal and state environmental and water quality laws and even put a condition in the grant that seeded areas would be mulched in accordance with Washington standards. Moreover, the BPA investigated federal and state safety, health, environment, and water quality laws and also put a clause in its Memorandum of Understanding with the BLM that it would meet state standards when the standards did not conflict with the federal standards it is bound to follow. The BLM believed the BPA would fulfill this obligation and there is no allegation that the BPA is not complying with its agreements.
 
 
 70
 As to the decision of what route would cause the least environmental damage, the BLM, based on the information supplied to it in the BPA's EIS and its own brief analysis of the routes and knowledge of the area, believed that this requirement had been complied with. More importantly, there is no question that the examination done by BPA which resulted in the EIS is sufficient for purposes of FLPMA.
 
 
 71
 As to the allegation of the lack of compliance with § 503, in its report the BLM noted that there were no parallel corridors existing in this location. The BLM also put language in the permit reserving the right to grant additional rights-of-way or permits for compatible uses on, over, under, or adjacent to the land involved in this grant. And again, a more detailed examination of possible corridors was included in the consideration of alternatives prepared by the BPA. Thus, the two agencies of the Department sufficiently complied with § 503 in this case.
 
 
 72
 2. Was the BLM, in Issuing the FLPMA Permit, Required to Consider Lands in which the United States has Retained Mineral Rights?
 
 
 73
 The Landowners raise a second argument about the validity of the permit issued by the BLM to the BPA pursuant to FLPMA. They claim that because in some of the privately owned lands the power line crosses, the United States has retained mineral rights, the BLM should have required a right-of-way permit to cross these lands. The BLM concedes that it did not require the BPA to obtain a FLPMA permit for these lands.
 
 
 74
 Section 501(a) of FLPMA states that the Secretary of the Interior, "with respect to the public lands ... (is) authorized to grant, issue, or renew rights-of-way, over, upon, under, or through such lands for ... (4) systems for generation, transmission, and distribution of electric energy ...." 43 U.S.C. § 1761(a) (1976). "Public lands" is defined by § 103(e) as: "any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership ...." 43 U.S.C. § 1702(e) (1976).
 
 
 75
 The Landowners make the following argument: (1) when the lands were conveyed to the private parties the United States retained the mineral rights, (2) the mineral rights are administered by the BLM, (3) the mineral rights are interests in land, and (4) therefore, the privately held lands fit the definition of "public lands" in § 103(e).
 
 
 76
 The district court rejected this argument, holding that the term "public lands" in FLPMA should be interpreted in its traditional sense, and that the traditional meaning is land "subject to sale or other disposal under general laws." Newhall v. Sanger, 92 U.S. 761, 763, 23 L.Ed. 769 (1875). Thus, because the land in question did not fit that description, the district court held that FLPMA excluded from its right-of-way requirement privately held land even though the United States retained a mineral interest therein. We agree.
 
 
 77
 The legislative history of FLPMA gives us the starting point for our inquiry. When FLPMA was first introduced in Congress, the term "national resource lands" was used. 122 Cong.Rec. 4035 (1976). Later the congressional Joint Committee decided the statute would retain "the traditional use of the term 'public lands,' " H.Conf.Rep.No. 1724, 94th Cong., 2d Sess., 57, reprinted in, (1976) U.S.Code Cong. & Ad.News, 6175, 6229, thus clearly indicating that Congress wanted FLPMA to incorporate the term's traditional meaning. There was no further discussion of the term in Congress.
 
 
 78
 The Act as passed also suggests that Congress intended to incorporate the traditional meaning. The only definition given is the one quoted above, whose brevity would indicate that no major change of use was intended. In addition, FLPMA § 310 states that the BLM should continue to use existing rules and regulations until the Secretary has promulgated new ones, 43 U.S.C. § 1740 (1976), and BLM officials testified that the Secretary had not made a new official or unofficial interpretation of the term under this Act. There also is no conflicting judicial authority because no cases have yet interpreted this section.
 
 
 79
 We find that FLPMA mandates that the traditional meaning of "public lands" be followed. This is clear from the Act's legislative history, and from the Act itself. Thus, we must determine what the meaning is.
 
 
 80
 The United States Supreme Court has consistently held that "public lands" means lands which are subject "to sale or other disposal under general laws," Northern Lumber Co. v. O'Brien, 204 U.S. 190, 196, 27 S.Ct. 249, 251, 51 L.Ed. 438 (1907) (unanimous opinion); Bardon v. Northern Pacific Railway, 145 U.S. 535, 538, 12 S.Ct. 856, 857, 36 L.Ed. 806 (1892) (unanimous opinion); Newhall, 92 U.S. at 763, and does not include "(a)ll land, to which any claims or rights of others have attached." Payne v. Central Pacific Railway, 255 U.S. 228, 237-38, 41 S.Ct. 314, 316-17, 65 L.Ed. 598 (1921) (unanimous opinion); Northern Lumber Co., 204 U.S. at 196, 27 S.Ct. at 250; Bardon, 145 U.S. at 538, 12 S.Ct. at 857; see United States v. Hemmer, 241 U.S. 379, 385-86, 36 S.Ct. 659, 662, 60 L.Ed. 1055 (1916) (unanimous opinion). This has been held to be the meaning habitually used in acts of Congress, unless a statute explicitly provides for a different meaning for the term. Bardon, 145 U.S. at 543, 12 S.Ct. at 859. Moreover, this meaning has been used continually in many congressional acts that the Secretary of the Interior has had to interpret. Payne, 255 U.S. 231, 41 S.Ct. 314; Minnesota v. Hitchcock, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954 (1902); Newhall, 92 U.S. 761, 23 L.Ed. 769.
 
 
 81
 We thus hold that privately held lands in which the United States has retained mineral rights are not subject to FLPMA's right-of-way requirements. They are not "public lands" as defined by the Supreme Court because they clearly are not subject to sale under general laws, and there certainly are other claims or rights attached to them. Consequently, we hold that the FLPMA right-of-way permit, as issued, is valid.
 
 
 82
 E. Must the BPA Comply with the Standards of the Washington State Energy Facility Siting Act and the Franklin County Comprehensive Plan and Receive a Certificate from the Governor of Washington?
 
 
 83
 Intervenors, the State of Washington and Franklin County, argue that the FLPMA right-of-way permit issued by the BLM to the BPA obligated the BPA to comply with Washington's Energy Facility Siting Act (Siting Act), Wash.Rev.Code § 80.50 et seq. (1974), and with Franklin County's land use regulations. Further, they contend that this means that the BPA must meet the substantive standards of the state's Siting Act, for example tower heights and spacing, and that the BPA must also go through the state's regulatory process and receive a certificate from the Governor. The BPA did not apply for a certificate. We do not know if the project meets the Act's substantive standards, but Intervenors do not present any evidence that it does not.
 
 
 84
 The BPA's right-of-way permit is "subject to the provisions, limitations, and conditions of Title V" of FLPMA. Thus, because the permit does not add any requirements of its own, the issue is what does FLPMA obligate the BPA to do. The important section for our inquiry is § 505:
 
 
 85
 Each right-of-way shall contain (a) terms and conditions which will ... (iv) require compliance with State standards for public health and safety, environmental protection, and siting, construction, operation, and maintenance of or for rights-of-way for similar purposes if those standards are more stringent than applicable Federal standards ....
 
 
 86
 43 U.S.C. § 1765 (1976) (emphasis added).
 
 
 87
 The precise issue of statutory interpretation involved is the meaning of the phrase "compliance with State standards." Does it refer only to the state's substantive requirements, or does it include the state's regulatory procedures as well?
 
 
 88
 The parties agree that the rule established by the United States Supreme Court in Hancock v. Train, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976), and its companion case, EPA v. State Water Resources Control Board, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), controls this case. Both of these cases involved a federal installation that was emitting pollution in a state that had a permitting system to regulate such polluters. The question presented was whether the federal installation had to apply for and receive a permit from the state, and had to meet the substantive standards of the state act, or whether it only had to get a permit from the Environmental Protection Agency and meet the federal standards.
 
 
 89
 In these cases the Supreme Court held that a federal agency performing a federal function is not required to submit to a state regulatory procedure, absent a "clear and unambiguous" congressional statement to that effect. Hancock, 426 U.S. at 179, 96 S.Ct. at 2013; EPA, 426 U.S. at 211, 96 S.Ct. at 2028.
 
 
 90
 Hancock involved the statutory interpretation of § 118 of the Clean Air Act. Section 118 reads:
 
 
 91
 Each department, agency, and instrumentality of the ... Federal Government ... (2) engaged in any activity resulting, or which may result, in the discharge of air pollutants, shall comply with Federal, State, interstate, and local requirements respecting control and abatement of air pollution to the same extent that any person is subject to such requirements.
 
 
 92
 42 U.S.C. § 1857f (1970) (emphasis added).
 
 
 93
 The statute in EPA was the Federal Water Pollution Prevention and Control Act Amendments (Water Pollution Act), 33 U.S.C. § 1251 et seq. (Supp.IV 1974). Section 313, the relevant provision, is virtually identical to the statute involved in Hancock, except for a reference to service charges:
 
 
 94
 Each department, agency, or instrumentality of the ... Federal Government ... (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants shall comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements, including the payment of reasonable service charges.
 
 
 95
 33 U.S.C. § 1323 (Supp.IV 1974) (emphasis added).
 
 
 96
 In interpreting these statutes, the Court made a distinction between being required to meet the state's substantive standards, the level of pollutants allowed, and being required to go through the regulatory process and obtain a permit from the state.
 
 
 97
 First, in both of these cases, the Court found that the federal installation did not have to go through the state's regulatory process. In Hancock, the Court discussed the established principle of federal supremacy over the states. "It is a seminal principle of our law 'that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and cannot be controlled by them.' " Hancock, 426 U.S. at 178, 96 S.Ct. at 2012 (quoting M'Culloch v. Maryland, 4 Wheat. 316, 426, 4 L.Ed. 579 (1819)). This principle, the Court stated, included the concept " 'that the activities of the Federal Government are free from regulation by any state.' " Id., 426 U.S. at 178, 96 S.Ct. at 2012 (quoting Mayo v. United States, 319 U.S. 441, 445, 63 S.Ct. 1137, 1139, 87 L.Ed. 1504 (1943) (footnote omitted)). Although Congress can make exceptions to this principle in specific cases, Congress must "clearly and unambiguously" state its intention to do so. Id., 426 U.S. at 179, 96 S.Ct. at 2013.
 
 
 98
 Applying this principle to § 118 of the Clean Air Act, the Hancock Court found that this statute did not clearly state that Congress intended to subject federal agencies to state permits. 426 U.S. at 180, 96 S.Ct. at 2013. The statute referred only to "requirements"; it did not speak of procedures. It did not say that federal installations must comply with all federal, state, and local requirements to the same extent as any other person, or even with all requirements of the applicable state implementation plan. Id. at 182, 96 S.Ct. at 2014. To have required the federal agency to get a permit, the Court stated, would give the states undue control over the federal installation. The permitting system did more than simply regulate the amount of pollutants because the state could forbid the installation from operating if it did not have a permit, even if the installation complied with the pollution standards. Congress, the Court found, had not intended such an extreme delegation of power from the federal agency to the states. The statement that the federal agency had to "comply with state requirements" was simply not a clear enough expression of congressional intent that the federal installation should be subject to state regulatory procedures. Id. at 180, 96 S.Ct. at 2013. Similarly, because § 313 of the Water Pollution Act was virtually identical and there was no significantly different legislative history, the EPA Court also held that the federal installation did not have to obtain a permit from the state to operate. EPA, 425 U.S. at 227, 96 S.Ct. at 2035.
 
 
 99
 Second, in both these cases, the Court held that the federal agency did have to meet the level of pollutants the state's acts required private individuals to meet. This, the Court found, was unquestionably required by the plain language of these statutes, as well as from their legislative historys. For example, in examining the legislative history of § 118, the Hancock Court noted that the House bill said that federal installations must comply with Federal, State, interstate, and local "emission standards." The Senate amendments used the terms "emission standards," and "emission requirements" interchangeably. There was no mention of any disagreement over which term to use, or explanation why one was chosen over the other. The Court thus determined that "requirements" was synonomous with "standards" in this case, Hancock, 426 U.S. At 189, 96 S.Ct. at 2017, and that "standards" meant emission limitations and compliance schedules. Id. Therefore, Congress had clearly expressed its desire that the federal installation abate its pollution to the same extent as any other contaminant source, and under the substantive standards that the state had prescribed. Again, because § 313 of the Water Pollution Act also used the term requirements and had similar legislative history, the Court held the same way in EPA. 426 U.S. at 227, 96 S.Ct. at 2035.
 
 
 100
 Returning to the case at hand, our inquiry is the statutory interpretation of § 505 of FLPMA, specifically the phrase "compliance with State standards." We find, first, that this clearly indicates congressional intent that the BPA meet the substantive standards of the State of Washington's Siting Act. This question is easier in this case than it was in Hancock or EPA. In those cases the Supreme Court found reasons why the term "requirements" meant "standards," and that "standards" meant the substantive standards of the state's act. Here, the statute already says "standards" we are saved a step in the analysis.
 
 
 101
 This interpretation is also warranted by the legislative history of FLPMA. The Senate bill asked that the Secretary of the Interior " 'insofar as he finds feasible and proper' ... 'coordinate' BLM plans with State and local land use plans, ... (and) 'consider current use and zoning patterns of land affected by the use of' BLM lands." 122 Cong.Rec. 24699 (1976) (emphasis added). The House version required that right-of-way permits " 'conform to State and local plans to the maximum extent consistent with Federal law and the purposes of' the legislation." Id. (emphasis added). The members of the Joint Conference adopted the House requirement that BLM comply with, rather than merely consider, federal and state pollution standards. H.Conf.Rep.No. 1724, 94th Cong., 2d Sess., 58, reprinted in (1976) U.S.Code Cong. & Ad.News 6175, 6229. This clearly indicates congressional intent to require federal agencies to meet the state's substantive standards for projects under FLPMA.
 
 
 102
 Our next inquiry is whether the BPA also must go through the certification process and get a certificate from the Governor. We hold that it does not. The statute refers to standards, it does not mention procedures. As in Hancock, there is no reference here to complying with all of the state's laws, or with all requirements of a permitting system. The Act only refers to standards. The statute never defines the term, nor does its legislative history, but the normal use of the term, and that used by the Supreme Court in Hancock and EPA, is "substantive requirements."
 
 
 103
 Moreover, to require the BPA to receive a state certificate would imply that the state could deny the application, which would give them a veto power over the federal project. This clearly cannot be the meaning that Congress intended. Much stronger language would be needed for us to conclude that Congress was delegating so much power from the federal government to the states. Congress would not delegate such an important function as the decision of whether and where to distribute electric power from federal facilities to total state control in such a brief statement.
 
 
 104
 The Landowners cite California v. United States, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), as support for their position. We, however, find that case to be readily distinguishable, and, in fact, further support for our holding today. In California, the BR proposed to construct a dam project in the State of California as authorized by the Reclamation Act. 43 U.S.C. § 371 et seq. (1976). The Supreme Court held that the BR had to apply for a state water appropriation permit and was bound by the conditions placed therein by the state. This conclusion, however, was based on the very clear and specific language of § 8 of that act:
 
 
 105
 (N)othing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State, or Territory relating to the control, appropriation, use or distribution of water used in irrigation, ... and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws.
 
 
 106
 43 U.S.C. § 383 (1974) (emphasis added).
 
 
 107
 This language is clear. Congress referred to complying with all state laws, not merely standards. This is the very kind of language that the Supreme Court specifically said was missing in Hancock, 426 U.S. at 182, 96 S.Ct. at 2014, and in EPA, 426 U.S. at 212-13, 96 S.Ct. at 2028-29. Section 8 leaves no room for doubt, and the Court so held. California, 438 U.S. at 675, 98 S.Ct. at 3001.
 
 
 108
 Although we hold that the BPA need not get a certificate from the state, we do require it to submit the information relevant to the substantive standards to Washington's Energy Facility Site Evaluation Council. The BPA is not required to go through the entire certification process, but it does need to submit the information which Washington needs to determine whether the BPA has indeed met the state's substantive standards of its siting act. Specifically, this means that the BPA must disclose the information required in Chapter 463-42 WAC of the Washington Siting Act. For example, the BPA must submit a description of the proposed construction, WAC 463-42-210, and an indication of the federal, state and industry criteria used in the transmission route selection process, WAC 463-42-250.
 
 
 109
 The purpose of this requirement is to help Washington enforce its standards. It would be difficult for the state to get this information on its own, and the BPA has it readily available. We have thus shifted the burden of producing this data to the party on whom it is the lightest. This was not required in Hancock or EPA because in those cases the federal government had a permit system under the Environmental Protection Agency that would enforce the state's pollution standards. The federal government does not have an applicable permit and enforcement system for transmission facility sitings. Therefore, we require this of the BPA, as a way of helping to insure that the substantive standards of Washington's Siting Act are met.
 
 
 110
 Intervenor Franklin County (the County) contends that the BPA must comply with the County's comprehensive land use plan. The County argues that because it is required to make a comprehensive plan under a Washington act, RCW 36.70.320, the BPA must comply with the plan. We disagree.
 
 
 111
 Section 505 of FLPMA states that the BPA must comply with State standards. This is in contrast to the statutes in Hancock and EPA, which specifically said the federal installment had to comply with state, interstate, and local requirements. If Congress had meant to include local plans such as that of Franklin County, they could have easily worded the statute to reflect that intent. We therefore hold that the BPA is not required to comply with the terms of the Franklin County Comprehensive Plan.
 
 
 112
 F. Was the District Court Correct in Ruling that the BPA Must Obtain a FLPMA Right-of-Way Permit from the BR before Proceeding with the Power Line Project?
 
 
 113
 The district court held that when the BPA's power line crossed land administered by both the BLM and the BR, the BPA had to obtain a FLPMA right-of-way permit from both of these agencies. The government contends, on cross-appeal, that the district court incorrectly interpreted FLPMA to require the BPA to obtain a right-of-way permit from the BR. The government maintains that the FLPMA right-of-way provisions apply only to "public lands" administered by the BLM, and to lands within the National Forest System (national forest lands), lands under the jurisdiction of the Secretary of Agriculture.
 
 
 114
 Section 507 is the section that authorizes the granting of rights-of-way to federal agencies. Section 507(a) provides:
 
 
 115
 The Secretary concerned may provide under applicable provisions of this subchapter (title V) for the use of any department or agency of the United States a right-of-way over, upon, under or through the land administered by him, subject to such terms and conditions as he may impose.
 
 
 116
 43 U.S.C. § 1767 (1976) (emphasis added).
 
 
 117
 The question before this Court is what lands does this section cover? Is it all lands administered by the Departments of Agriculture and Interior, or is it only "public lands" administered by the BLM and national forest lands administered by the Secretary of Agriculture?
 
 
 118
 The issue is created by the ambiguous way the statute is written. Section 507 says "The Secretary concerned" may grant rights-of-way as authorized by other provisions of Title V to government departments or agencies. The statute is not clear, however, on which Secretary or Secretaries are included in § 507. The "applicable provision" of Title V for authorization to grant rights-of-way for power lines is § 501(a), and that section explicitly refers to two different Secretaries and two different categories of land:
 
 
 119
 The Secretary (of the Interior), with respect to the public lands and, the Secretary of Agriculture, with respect to lands within the National Forest System (except in each case land designated as wilderness), are authorized to grant, issue, or renew rights-of-way over, upon, under, or through such lands for ... (4) systems for generation, transmission, and distribution of electric energy ....
 
 
 120
 43 U.S.C. § 1761 (1976) (emphasis added). According to this section, rights-of-way can be granted only for "public lands" and national forest lands. The ambiguity arises because right-of-way is defined in § 103(f) to include only rights-of-way that "transverse public lands." 43 U.S.C. § 1702(f) (1976) (emphasis added), there is no mention in this definition of national forest lands. Further, "public lands" is defined by § 103(e) as those lands that are administered by the BLM, again with no mention of national forest lands. 43 U.S.C. § 1702(e) (1976). Thus, the definitions and the provisions of Title V are inconsistent as to what lands are covered. In some sections it seems that only public lands are covered by the right-of-way provisions of FLPMA, and yet other sections include forest lands as well.
 
 
 121
 The district court resolved this ambiguity by interpreting § 507 to apply to all lands administered by the Secretaries of Agriculture and Interior. The court noted that the definition of right-of-way included only rights-of-way transversing "public lands," but held that FLPMA should nonetheless apply to rights-of-way transversing all lands administered by the Secretaries of Agriculture and Interior. The court reasoned that because the Secretary of Agriculture, and the national forest lands under his jurisdiction, are not mentioned in the definition of rights-of-way and yet are included in § 501, the section that authorizes granting such rights-of-way, then the definitions are not all-inclusive and lands other than BLM "public lands" are encompassed by the Act. Therefore, the court concluded that FLPMA covers all of the lands under the Departments of Agriculture and Interior, and thus that the BR is included within the purview of the Act.
 
 
 122
 It is true that the definitions in FLPMA are somewhat inconsistent with the provisions of Title V, and that the statute must be interpreted in a way that resolves this conflict. We find, however, that the district court resolved this conflict incorrectly, and that the proper interpretation of § 507 is that it applies only to public lands administered by the BLM and to national forest lands administered by the Department of Agriculture. It does not cover all of the lands administered by the Departments of Agriculture and Interior, and therefore does not include the BR.
 
 
 123
 The major error in the district court's reasoning is that the district court did not give sufficient attention to the fact that the national forest lands were specifically discussed and included by Congress within certain provisions of FLPMA. The national forest lands do not appear in FLPMA merely as an example of one of the many types of lands under the jurisdiction of the Departments of Agriculture and Interior that FLPMA covers.
 
 
 124
 An examination of the legislative history of FLPMA clearly shows that this interpretation is correct. Throughout FLPMA's legislative history the Act was referred to as the "organic act" of the BLM. See, e. g., H.Conf.Rep.No. 1724, 94th Cong., 2d Sess., 57, reprinted in (1976) U.S.Code Cong. & Ad.News, 6175, 6228. The preeminent purpose of the Act was to "(e)stablish a mission for the public lands administered by the Secretary of the Interior through the Bureau of Land Management." H.R.Rep.No. 1163, 94th Cong., 2d Sess., 2, reprinted in (1976) U.S.Code Cong. & Ad.News, 6175, 6176. Thus, originally, the Act was only addressed to the BLM in an effort to simplify and unify the laws relating to the millions of acres of land administered by this agency. Later during the legislative process, amendments were introduced in the House that proposed including the national forest lands in some of FLPMA's provisions, most notably, the right-of-way provisions of Title V. A Senate bill provided that national forest lands be included only in the mining claims and patent provisions. The Joint Conference accepted the House amendments which made the rights-of-way provisions applicable to the national forest lands. H.Conf.Rep.No. 1724, 64, reprinted in (1976) Cong.Code & Ad.News, 6175, 6236.
 
 
 125
 The decision to include the national forest lands in certain provisions of FLPMA is clearly reflected in the Act. Many of the substantive provisions of FLPMA, including sections of Title V, are explicitly made applicable to national forest lands. The BR, by contrast, is never mentioned in either the Act or its legislative history.
 
 
 126
 Reading the Act as a whole leaves no question that FLPMA was expanded only to include these lands. The Act's major purpose is still to regulate BLM lands, with this one expansion for the Secretary of Agriculture and the national forest lands under his jurisdiction. It is not an Act made to change the powers of all of the agencies under the jurisdiction of the Departments of Agriculture and Interior. There is simply no indication from the Act or from its legislative history that it is meant to cover any agencies not specifically referred to therein. To read FLPMA as a vehicle for regulating all of the agencies under the Departments of Agriculture and Interior would unduly broaden the scope of this statute, and would cause this Court to step beyond its power of statutory interpretation. The ambiguity created by the substantive provisions and the definitions is a situation of unfortunate drafting, but the intent of Congress as to the coverage of the Act is clear nonetheless.
 
 
 127
 We thus find that the language of § 507, "The Secretary concerned," is merely a shorthand way of referring to the Secretary of the Interior for "public lands," and the Secretary of Agriculture for national forest lands. Therefore, we hold that the district court was incorrect in its holding that the BR is included under the purview of FLPMA, and that the BPA had to receive a FLPMA right-of-way permit from the BR.
 
 IV
 CONCLUSION
 
 128
 For the reasons stated above, we make the following holdings: (1) the Environmental Impact Statement (EIS) made by the BPA for the power line project is adequate according to the provisions set forth in the National Environmental Policy Act of 1976; (2) the decision of the BPA to build the power line along Route D-1 was not arbitrary and capricious; (3) the Memoranda of Understanding between the BPA and the BLM, and the BPA and the BR, did not require the preparation of a separate EIS; (4) the right-of-way permit issued by the BLM to the BPA was in conformity with the applicable provisions of the Federal Land Policy and Management Act of 1976 (FLPMA); (5) the BPA must comply with the substantive standards of the Washington State Energy Facility Siting Act (Siting Act); (6) the BPA is not required to receive a Siting Act certificate from the Governor of Washington; (7) the BPA is not required to comply with the substantive standards of Franklin County's comprehensive land use plan; (8) the BPA must submit to the Washington Energy Facility Siting Evaluation Council the information which the state needs to determine whether the BPA has indeed met the substantive standards of the state's Siting Act; and (9) the district court incorrectly interpreted FLPMA to require the BPA to obtain a right-of-way permit from the BR before proceeding with the transmission line.
 
 
 129
 Affirmed in part, reversed in part.
 
 
 130
 KARLTON, District Judge, dissenting.
 
 
 131
 With the greatest of respect I dissent. It is my view that this matter should have been disposed of in an unpublished opinion dismissing the appeal as moot. The opening paragraph of the majority opinion demonstrates mootness. As the majority says, "All 191 towers required for the new line have been erected and the line has been in operation since 1978." Since, as I demonstrate below, the legal context in which this case was decided is no longer applicable, the case has little precedential value. Accordingly, it should not be published. Rule 21, Rules of the United States Court of Appeals for the Ninth Circuit.
 
 
 132
 Rather than dismissing the appeal as moot the majority undertakes a canvass of some of the most difficult issues of environmental law and, in my opinion, resolves some of those questions in a manner inconsistent with existing Ninth Circuit doctrine. This Court has no power to render advisory opinions. FCC v. Pacifica Foundation, 438 U.S. 726, 734, 98 S.Ct. 3026, 3032, 57 L.Ed.2d 1073 (1978), yet that is precisely what we do when we decide a case which is moot. Nonetheless, inasmuch as the majority has chosen to proceed, I am compelled to set forth wherein I believe the opinion is in error.
 
 
 133
 * ADEQUACY OF THE EIS[1]
 
 A. Standard of Review
 
 134
 The majority's general discussion of the standard of review of an EIS, while correct as far as it goes, fails to incorporate a fundamental notion of Ninth Circuit doctrine. The majority quite properly recognizes that the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4335 (1976) (a statute which emphasizes procedural regularity), does not permit a court to substitute its judgment for that of an administrative agency. However, as this Court has recently observed, "(w)hen substantive judgments are committed to the very broad discretion of an administrative agency, procedural safeguards that assure public access to the decisionmaker should be vigorously enforced." Western Oil & Gas Association v. EPA, 633 F.2d 803, 813 (9th Cir. 1980). Failure to recognize this standard is significant in this case. As I shall seek to demonstrate, the failure to include the internal memoranda with their two tables which the majority sanctions precluded "public access to the decisionmaker" and thus rendered the EIS NEPA deficient.
 
 
 135
 B. The Failure to Include the Internal Memoranda With Their Two Tables Prepared by the BPA Rendered the EIS Insufficient.
 
 
 136
 The majority recognizes the NEPA requirement that the EIS must be a "full disclosure document" and that "one of the purposes of an EIS is to insure full disclosure of the economic consequences of the project." Nonetheless, the opinion sanctions failure to note or incorporate into the EIS memoranda which bear critically upon the economic factors ultimately used by the agency to justify its selection of a route for the power lines in question. As the majority properly points out, an EIS is sufficient "if it ... provides the information that the public needs to enable both those who would challenge, and those who would support the project to respond effectively." That is, the corollary of vigorous enforcement of access to the decisionmaker is sufficient information about the decisionmaking process to make access meaningful. "(A)n EIS is in compliance with NEPA when its form, content, and preparation substantially ... (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information." Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir. 1974) (emphasis added). Although recognizing the test the majority fails to apply it.
 
 
 137
 The agency selected Route D-1 because it believed that D-1 was the cheapest route. The majority recognizes that the EIS must fully disclose "the economic ... benefits." The corollary of that doctrine must be that the agency must provide information in the EIS in a form and with content sufficient to permit public participation in the development of that economic judgment as well. That is precisely what was not done here. The agency developed a tabular method of comparison of the cost of several of the routes and the underlying cost estimates from which the overall costs estimates were derived. This information was simply never made available to the public. How could either supporters or challengers of the conclusion that D-1 was the cheapest route evaluate that conclusion when the very analytical tools used by the agency in arriving at its conclusion were simply hidden from public view?
 
 
 138
 The majority rationalizes the omission on two bases: (1) the creation of an otherwise undefined "working paper" exception, and (2) the creation of a hitherto unrecognized "harmless error" doctrine.[2] On close analysis the working paper exception is inconsistent with applicable law and the error is not harmless.
 
 
 139
 1. The Working Papers Exception.
 
 
 140
 Although the majority recognizes the "full revelation" purpose of an EIS, it may be read to severely delimit the application of the doctrine by the creation of an unlimited and undefined "working papers" exception. That exception is inconsistent with the regulations which bound the agency and with previous decisions of the courts.
 
 
 141
 The regulations governing the contents of an EIS at the time the instant document was prepared are found at 40 C.F.R. § 1500 (1975). They were originally promulgated by the Council on Environmental Quality in August 1973, 38 Fed.Reg. 20550 (1973) and remained in effect until July 30, 1979. 42 Fed.Reg. 55990 (1978). Whatever the reach of the working paper exception, the guidelines preclude the memoranda at issue from being so characterized. Two preliminary comments must be made about the effect of the guidelines. First, as to the agency the guidelines are binding. "It is by now axiomatic that agencies must comply with their own regulations while they remain in effect." Memorial, Inc. v. Harris, No. 78-3169, n.14 (9th Cir. March 28, 1980). Second, these regulations are entitled to substantial deference by the courts. Andrus v. Sierra Club, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979).[3]
 
 
 142
 The guidelines do not provide for a "working paper" exception to the disclosure of relevant information in an EIS. On the contrary, although an EIS must be succinct and easily understood, it must alert the public to reports which underlie the conclusions in the EIS and indicate how they may be obtained.
 
 
 143
 Draft statements should indicate at appropriate points in the text any underlying studies, reports, and other information obtained and considered by the agency in preparing the statement including any cost-benefit analyses prepared by the agency.... In the case of documents not likely to be easily accessible (such as internal studies or reports ), the agency should indicate how such information may be obtained.
 
 
 144
 40 C.F.R. § 1500.8(b) (1975) (emphasis added).
 
 
 145
 The phrase "underlying studies, reports and other information " could not be broader. Clearly it would encompass a memorandum containing two tables, one comparing alternatives and the other giving a cost breakdown for several of the alternative proposals including the one actually adopted by the agency.[4]
 
 
 146
 Given the regulations, it is difficult to rationalize the majority opinion. Certainly it cannot reasonably be argued that the memoranda in question did not contain "information obtained and considered by the agency in preparing the statement." Nor did their status as internal agency documents exempt them from disclosure. The guidelines specifically provided for "internal studies or reports" that might not be readily available to the public. While arguendo, the information in the memo did not have to be included in the body of the EIS, the guidelines require that the EIS alert the reader by footnote or other appropriate means to the existence of the memoranda and inform the public as to their availability. This was simply not done.
 
 
 147
 Thus, the regulations applicable to the EIS in question simply precluded a "working paper" exemption which would encompass the documents in question. Moreover, the regulations are fully consonant with applicable law.
 
 
 148
 The majority opinion concedes, as it must, that "(j)udicial enforcement of NEPA includes strict compliance with the disclosure and procedural provisions of the Act." Warm Springs Dam Task Force v. Gribble, 565 F.2d 549, 552 (9th Cir. 1977) (per curiam). This "full revelation" requirement is not merely a congressional fetish for information for its own sake. Full disclosure is required in order to give the public a way of "checking on the validity of the (agency's) conclusions." Chelsea Neighborhood Associations v. United States Postal Service, 516 F.2d 378, 389 (2d Cir. 1975); California v. Bergland, 483 F.Supp. 465, 488 (E.D.Cal.1980). Here, where basic information (the cost breakdown) supporting the economic conclusions was never supplied, it is impossible for the public to check on the conclusions. As the appellant's brief states "It is instructive to note that the individual that recommended the route selection to Mr. Bingham, Mr. Williams, candidly admitted that the EIS contained absolutely no tools with which it could be determined how the decisionmaker Mr. Bingham, selected Route D-1." Appellant's Opening Brief, pp. 41-42.
 
 
 149
 Under Ninth Circuit law "the adequacy of the EIS must stand or fall on its own supporting documentation." Coalition for Canyon Preservation v. Bowers, 632 F.2d at 782. Where the agency "simply does not reveal its process of decision-making (citations omitted) ... (it has) failed to make full environmental disclosure." California v. Bergland, 483 F.Supp. at 488.
 
 
 150
 In sum, as this Court recently said, the National Environmental Policy Act requires that all studies supporting an EIS must be "available and accessible." Coalition for Canyon Preservation v. Bowers, 632 F.2d at 782; see also Trout Unlimited v. Morton, 509 F.2d at 1284; Life of the Land v. Brinegar, 485 F.2d 460, 468-69 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The majority concedes the report was neither available nor accessible thus the EIS was deficient.
 
 
 151
 2. Harmless Error.
 
 
 152
 The second justification for non-inclusion of the memoranda is based upon a notion of "harmless error" never heretofore articulated in the cases. It is of course true that we do not "fly speck" the EIS. Nonetheless, such common sense self restraint has never been seen to sanction the omission of information central to the validity of the EIS.
 
 
 153
 The assertion of harmless error rests upon two bases: (1) that all of the information contained in the first table may be found somewhere in the EIS, and (2) that because the "total cost figure" was contained in the EIS, the omission of the breakdown of overall cost figures in terms of cost of land, surveying, design, materials, clearing, construction, material handling, and administrative overhead contained in the second memorandum but omitted from the EIS was not significant. As both a "pragmatic" matter, Warm Springs Dam Task Force v. Gribble, 565 F.2d at 552, and a factual matter, it appears to me that neither rationale stands scrutiny.
 
 
 154
 First, we need not speculate as to whether the memorandum comparing the cost of various routes would be useful to the public in assessing the agency's conclusion as to which route was cheapest. The agency's own action demonstrates its utility, it used the memos for the very purpose of comparing costs and reaching a decision. Indeed the cases have recognized that the form of the EIS must be such as to permit meaningful public participation. "(A)n EIS is in compliance with NEPA when its form ... substantially ... make(s) available to the public ... information ... and encourage(s) public participation...." Trout Unlimited v. Morton, 509 F.2d at 1283 (emphasis added). This emphasis of rational form is a persistent theme of environmental law. "The statement must set forth the material contemplated by Congress in form suitable for the enlightenment of the others concerned." Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 836 (D.C.Cir.1972) (emphasis added).
 
 
 155
 The applicable guidelines inferentially prohibit the scattering of information throughout the EIS and indicate a preference for a form such as the omitted comparative table. "In developing the above points agencies should make every effort to convey the required information succinctly in a form easily understood, both by members of the public and by public decisionmakers...." 40 C.F.R. § 1508(b) (1975). Certainly if the agency found the memorandum useful for comparative purposes, it is not unreasonable to suppose the public would. The new guidelines make what was implicit, explicit. They provide that the section of the EIS exploring alternatives "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14 (1980) (emphasis added).
 
 
 156
 The issue as to the second memo containing the underlying cost breakdown seems, if anything, clearer. It is apparent that the "overall" figure is of no use unless the underlying figures from which it is derived are accurate. The second memo is the only place to find the underlying figures and thus explore their accuracy, however it was not made available to the public. It is not possible to know what a close analysis of the tables vis-a-vis the overall cost would have provided. The interested public was simply precluded from making the analysis. As the Columbia Basin parties argued, they were precluded from making a "responsible appraisal of the various environmental costs, benefits and risks" by a failure to include the tables.
 
 
 157
 This case demonstrates both the reason for the strict application of the "full revelation rule" and the consequences of departure from that rule. Courts have heretofore consistently recognized that the failure to include such material must render the EIS deficient because of the danger of two possible consequences: "(1) the ultimate decision-makers will believe that there is no controversy due to the lack of critical comment; and (2) objective errors without being red-flagged would go unnoticed." Appalachian Mountain Club v. Brinegar, 394 F.Supp. 105, 122 (D.N.H.1975).
 
 
 158
 The majority is confident that had the agency done its NEPA duty the result would have been the same. The source of that confidence is unclear to me. Certainly it is not the EIS in question. The EIS does not contain the information necessary to inform such a judgment. Yet under the law, the EIS and its incorporated material is the only permissible source for justification of the agency's conclusions. While those attacking the administrative determination explained in the EIS are by necessity not ordinarily bound by the administrative record, see, e. g., Asarco, Inc. v. EPA, 616 F.2d 1153 (9th Cir. 1980), generally justification for the agency's decision "is limited to the four corners of the environmental statement itself, since it is the administrative record for the purposes of review. See e. g. Jicarilla Apache Tribe v. Morton (9th Cir. 1973) 471 F.2d 1275, 1286." (balance of citations omitted) California v. Bergland, 483 F.Supp. at 488. As this Court recently held, "Consideration of the evidence (i. e., evidence outside the administrative record) to determine the correctness or wisdom of the agency's decision is not permitted, even if the court has also examined the administrative record." Asarco, Inc. v. EPA, 616 F.2d at 1160.
 
 
 159
 It is, of course, true that binding precedent precludes the courts from second-guessing an agency's decision if it is not arbitrary and capricious but, the same precedent mandates that the public be given the very opportunity to second guess denied the courts. Western Oil & Gas Association v. EPA, 633 F.2d at 810-11. By failing to reveal the memo and thus depriving the public of both the critical information the agency relied on and its own mode of analysis, BPA denied the public that very opportunity to participate in the decisionmaking process which is among the very purposes of the Act itself. 42 U.S.C. § 4332(2)(C).
 
 II
 
 160
 WAS THE BPA'S DECISION TO CONSTRUCT ALONG ROUTE D-1
 
 
 161
 ARBITRARY AND CAPRICIOUS?
 
 
 162
 The majority treats the question of the arbitrary and capricious nature of the BPA's decision as one of fact and upholds the district court's conclusion that the decision was "based on legitimate economic considerations reflected in the EIS .... Route D-1 was the cheapest." The "arbitrary and capricious determination" is one of both fact and law. The majority is of course correct when it says that "a 'court is not empowered to substitute its own judgment for that of the agency.' " That is not the question. The question here is whether the EIS demonstrates that the agency understood the "finely tuned and 'systematic' balancing analysis" required of it. Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission, 449 F.2d 1109, 1113 (D.C.Cir.1971); See Coalition for Canyon Preservation v. Bowers, 632 F.2d at 781-83. It appears to me that the question of the agency having undertaken the required analysis raises questions of both fact and law. Asarco, Inc. v. EPA, 616 F.2d 1153. Assuming arguendo, however, that the issue is one of fact, there simply is no adequate basis in fact to determine the issue. Certainly the agency may determine that the economic factors are overriding, but in doing so it must explain why. The EIS itself must document and explain its decision. "Predominant is the rule that agency action must be examined by scrutinizing the administrative record at the time the agency made its decision." Id. at 1159. Here, given the absence of a full analysis with cost breakdown of all six routes, it simply cannot be ascertained from the EIS that the route selected was in fact the least costly. Since the comparative data was not subjected to critical public examination as to three routes, and apparently was not even available to the agency as to three others, the record simply does not present a factual basis for this Court to uphold the agency's determination. In that sense the determination is arbitrary and capricious. Id. at 1162.
 
 III
 
 163
 WAS THE PERMIT AS ISSUED IN COMPLIANCE WITH FLPMA?
 
 
 164
 The majority resolves the critical question of whether the Bureau of Land Management could defer its duty under FLPMA to the Bonneville Power Administration by according to the agency's statutory interpretation "great deference." It suggests that "the standard of judicial review is whether the agency interpretation was reasonable." Because of this approach, the majority opinion does not itself undertake independent legal analysis to determine whether the deferral was statutorily authorized. I believe that this analytical approach has led to error. Prior to undertaking such an independent legal analysis, it appears that some brief discussion of the deference doctrine is appropriate.
 
 
 165
 As the majority acknowledges, deference to the agency's interpretation is justified only when the interpretation is within the agency's "expertise." Memorial, Inc. v. Harris, No. 78-3169. Here, what is at stake is no more than the agency's ability to read the statute. When what is at stake is an agency's legal evaluation, we may grant some deference to the agency's construction of the law it is charged to administer, Batterton v. Francis, 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977), but the final determination of a question of law is for the courts. Social Security Board v. Nierotko, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946). Moreover, deference is not the equivalent of a failure to examine the statute and determine whether the agency's interpretation is legally correct. "Thus, our deference does not extend to agencies' construction which conflict with statutory directives (citation omitted). Courts 'are not obligated to stand aside and rubber stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' " Pacific Coast Medical Enterprises v. Harris, 633 F.2d 123, 131 (9th Cir. 1980).
 
 
 166
 The issue is whether the Secretary could delegate his duty under FLPMA to the BPA rather than to the BLM. The statute is silent, and thus one might suppose that under ordinary principles of subdelegation the Secretary was free to do so. An examination of the statutory history, however, leads to the conclusion that the Secretary's determination to permit the BLM to defer to the BPA was not authorized by the statutes, or at least "frustrated the congressional policy underlying the statute." Indeed, the majority's own analysis of another issue (the "permit" issue) demonstrates that such is the case.
 
 
 167
 The majority thought itself faced with the necessity of resolving the question of whether the BPA needed to obtain a FLPMA right-of-way permit from the BR before proceeding with the power line project.[5] The statute could be read as requiring BR permits but the majority finds otherwise. This determination is based upon the fact that throughout FLPMA's legislative history the Act was referred to as the "Organic Act" of the BLM. Accordingly, by reading the legislative history the Court determines that the reach of FLPMA is restricted (with one exception) by its character as the organic charter of the BLM and thus reaches only BLM's administrative concern.
 
 
 168
 Given the Court's resolution of the permit FLPMA question, it is difficult to understand why both the analytical approach of examining the legislative history and the reasoning undertaken by the majority does not apply to the other FLPMA issue of which agency must perform the FLPMA duty. If a reading of the legislative history justifies the exclusion of public lands not administered by the BLM because FLPMA is the BLM's "organic charter," in like fashion such a reading requires the Secretary to exercise his FLPMA power through the BLM and not through the BPA. The majority makes no attempt to distinguish the two issues and I am unable to do so. My reading of the legislative history suggests that the resolution of the public lands issue by the majority is correct; the inevitable result of such a resolution, however, is that the Secretary's general discretion as to sub-delegation is limited by the purpose of the statute. It thus appears to me that the upholding of the Secretary's determination relative to the "public lands issue" inevitably results in a determination that the BLM's deference to the BPA is unauthorized by the statute. "The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law ... but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity." Manhattan General Equipment Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936); see also Dixon v. United States, 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965); Brown v. Harris, 491 F.Supp. 845 (N.D.Cal.1980).
 
 
 169
 One other brief comment on this issue appears appropriate. At least in part the majority seeks to justify the determination of the Secretary because he was dealing with a new statute and had not adopted regulations implementing the new statute, and because the administrative process had to continue pending the new regulations. This approach is inconsistent with Ninth Circuit doctrine. This Court has clearly held that "exemption for agencies operating under pressure of statutory deadlines ... would amount to judicial legislation. The urgency of the problem to be remedied does not justify the repeal by this court of the (requirements of law)." Western Oil & Gas Association v. EPA, 633 F.2d at 812.
 
 CONCLUSION
 
 170
 Although I believe the majority's resolution of the NEPA and FLMPA issues discussed above are erroneous, I reiterate that all of this extended discussion is beside the point. The questions are difficult and subtle. I believe that I am correct but certainly recognize that the majority's position is not without merit as well. This divergence of opinion only demonstrates again that it is inappropriate to discuss at length moot cases.
 
 
 
 *
 The Honorable Lawrence K. Karlton, United States District Judge, Eastern District of California, sitting by designation
 
 
 [1]
 This case is not moot, as the dissent contends. That the towers have been erected and the power line has been in operation since 1978, does not moot the claim that it should not be operating in its present location
 A case is moot if events have occurred that have caused it to lose its character as a "present, live controversy." Hall v. Beals, 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969) (per curiam) (appellants' constitutional challenge of a Colorado statute that set a six-month residency requirement for voting eligibility was held moot because by the time the case got to court the election was over, the parties had been residents for over six months, and, significantly, the law had been changed to a two-month requirement). See Powell v. McCormack, 395 U.S. 486, 496-97, 89 S.Ct. 1944, 1950-51, 23 L.Ed.2d 491 (1969). The Supreme Court has repeatedly addressed the mootness doctrine, stating that for a case to be cognizable in court, "(t)he controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of a specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct. 461, 463-64, 81 L.Ed. 617 (1937) (unanimous opinion) (citations omitted), quoted in e. g., Preiser v. Newkirk, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975), North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) (per curiam). See DeFunis v. Odegaard, 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974) (per curiam).
 In the case at hand, were this Court to find the EIS inadequate, or the decision to build along Route D-1 arbitrary and capricious, the agency would have to correct the decision-making process, and ultimately could be required to remove the line from this route. Clearly, therefore, this case presents a live controversy with concrete facts, and parties with adverse interests. The building of the towers has not made the case hypothetical or abstract the towers still cross the fields of the Landowners, continually obstructing their irrigation systems and this Court has the power to decide if they may stay or if they may have to be removed. Compare Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974) (although the settlement of a strike mooted the claim for injunctive relief, the request for a declaratory judgment was not moot because the challenged state policy of paying striking workers was not contingent and had not disappeared, but might have an adverse effect on the interests of the parties) and Allen M. Campbell Co. v. Lloyd Wood Construction Co., 446 F.2d 261, 264 (5th Cir. 1971) (the fact that construction on a government contract was "well underway" was not sufficient to moot the challenge to the appropriateness of the contract award), with Friends of the Earth, Inc. v. Bergland, 576 F.2d 1377, 1378-79 (9th Cir. 1978) (where all work on exploratory mining operation had ceased, and the appellate court could not undo what had been done, a challenge to the approval of the drilling based on alleged lack of compliance with NEPA was moot) and DeFunis v. Odegaard, 416 U.S. 312, 317, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (claim for injunctive relief was held moot where appellant challenged the admissions policy of a law school but the student was later admitted and would be allowed to finish regardless of the outcome of the suit).
 If the fact that the towers are built and operating were enough to make the case nonjusticiable, as the dissent states, then the BPA (and all similar entities) could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine. Such a result is not acceptable. Indeed, the exacting standard that the dissenting opinion applies that any and all information that could be helpful to a decision-maker must be included in the EIS or it is inadequate seems incompatible with its apparent readiness to "forgive" potentially egregious NEPA violations by invoking the mootness doctrine whenever the challenged "major Federal action" has been completed prior to the exhaustion of the litigation.
 
 
 [2]
 It is irrelevant that the discussion of Route E alternative is not physically located in the same areas of the EIS as the four alternatives presented by the BPA. This occurred because the Route E alternative was considered at the urging of the Landowners. The key factor is that each route was given as rigorous an explanation and as objective an evaluation as any other
 
 
 [3]
 Trout Unlimited discusses this issue in a footnote:
 Appellants argue that an EIS must include a discussion of the secondary impacts as a substantive requirement .... While agreeing that under a given factual situation failure to include a discussion of secondary impacts might render an EIS fatally defective, we can not say that a specific treatment of secondary impacts is a substantive requirement of the impact statement. The central focus should not be on a primary/secondary impact analysis but upon those impacts (either primary or secondary) which have a "significant impact" upon the environment.
 509 F.2d at 1283, n.9 (citation omitted).
 
 
 [4]
 The parties in this case used the term "Memorandums of Understanding." We, however, prefer to use the plural form of "Memoranda."
 
 
 [5]
 Mr. Martin is the BLM official who does the actual processing of these permits and who drafts the BLM's reports pursuant to them. Although one official of the BLM did not agree with his interpretation of FLPMA on this point, Mr. Martin is referred to as the BLM's expert "lands man" and he is relied upon to process these applications. Therefore, we consider him the voice of the BLM application office for this claim
 
 
 [6]
 For example, the FLPMA permit does not allow the BPA to do any construction during the five months of the year when waterfowl use the island for nesting, and maintenance work during this period is to be kept to a minimum
 
 
 [1]
 For the sake of convenience I have maintained the abbreviations used in the majority opinion
 
 
 [2]
 The majority also mentions the so-called "good faith" doctrine although it does not in any fashion apply it to the facts of this case. I do not understand the majority to be suggesting that "good faith" is yet a further justification for upholding the EIS. Such reticence is of course correct inasmuch as this Court has recently observed, "(s)ubjective good faith is not the test for determining the adequacy of an EIS. The test is an objective one. Concerned About Trident v. Rumsfeld, 555 F.2d 817, 827 (D.C.Cir.1977)." Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 782 (9th Cir. 1980). That is, if the EIS is insufficient under the law, the subjective good faith of those who prepared it is simply irrelevant
 
 
 [3]
 As I explain, infra, deference is not the equivalent of subordination of judicial duty to executive decision, but here the majority does not even mention the pertinent regulations
 
 
 [4]
 One reason this case should not be published is that it can have little direct precedential value. New regulations have been issued. Although in my opinion they, too, would require inclusion or reference to the memoranda, that conclusion requires extended analysis. See and compare 40 C.F.R. § 1502.1 (1980) and 40 C.F.R. § 1502.14. In any event, this case has no precedential value for cases arising under the new regulations
 
 
 [5]
 Since I believe this appeal should be dismissed as moot, it is obvious that I do not believe that we had to reach this or any other of the issues reviewed by the majority. Even if I am in error in general, however, this issue is moot in every and any sense. First, pursuant to the district court's order the BPA did obtain a permit from the BR thus disposing of the issue. Second, as to whether the BLM could defer to BPA, that situation is simply incapable of repetition under present law. The majority's resolution is dependent upon the BLM and BPA both being under the jurisdiction of the Secretary of Interior such is no longer the case. BPA is under the jurisdiction of the Secretary of Energy. 42 U.S.C. § 7152