AMERICAN MOTORCYCLIST ASSOCI-ATION etc., et al., Plaintiffs,

v.

James G. WATT *, etc., et al., Defendants.

COUNTY OF INYO, etc., Plaintiff,

v.

James G. WATT *, etc., et al., Defendants.

NATIONAL OUTDOOR COALITION, Plaintiff,

v.

James G. WATT *, etc., et al., Defendants.

CALIFORNIA NATIVE PLANT SOCIE-TY, etc., et al., Plaintiffs,

v.

James G. WATT *, etc., et al., Defendants.

Nos. CV 80–5561–AWT, CV 80–5599–AWT, CV 80–5629–AWT and CV 81–489–AWT.

United States District Court, C. D. California.

Dec. 1, 1981.

---

* Substituted for Cecil D. Andrus, former Secretary of the Interior, pursuant to Rule 25(d), Fed.R.Civ.P.

Robert E. Hinerfeld, Murphy, Thornton, Hinerfeld & Cahill, Los Angeles, Cal., for American Motorcyclist Ass'n.

Dennis L. Myers, County Counsel, Independence, Cal., for County of Inyo.

Karen L. Patterson, Kinsella, Boesch, Fujikawa & Towle, Los Angeles, Cal., for Nat. Outdoor Coalition.

Laurens H. Silver, Sierra Club Legal Defense Fund, Inc., Mark I. Weinberger, Shute, Mihaly & Weinberger, San Francisco, Cal., for California Native Plant Society, et al.

Andrea Sheridan Ordin, U. S. Atty., Frederick M. Brosio, Asst. U. S. Atty., Chief, Civ. Div., James R. Arnold, Asst. U. S. Atty., Los Angeles, Cal., for James G. Watt, et al.; Robert E. Conover, Field Sol., Dept. of the Interior, of counsel.

## MEMORANDUM DECISION

TASHIMA, District Judge.

Plaintiffs in all but one of these consolidated actions, American Motorcyclist Association and Sports Committee, District 37, A.M.A., Inc. (collectively "AMA"), County of Inyo and National Outdoor Coalition ("NOC"),[1] have each moved for a prelimi-

---

1. These four actions were consolidated on the Court's own motion, pursuant to Rule 42(a), Fed.R.Civ.P. The motion of plaintiffs California Native Plant Society, et al., to deconsolidate No. CV 81–489 from the other cases was denied on May 18, 1981. Plaintiff Sierra Club has

nary injunction restraining defendants, the Secretary of the Interior ("Secretary"), the Director of the Bureau of Land Management ("BLM"), Department of the Interior, and the California State Director of BLM, from implementing the California Desert Conservation Area Plan (the "Plan"), which was prepared by the BLM pursuant to Section 601 of the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1781.[2] Section 601 requires the Secretary to inventory the resources in the California Desert Conservation Area ("CDCA") and prepare a comprehensive land use management plan for the area. The CDCA and the Plan cover the more than 12 million acres of desert land in the State of California which are owned by the United States and administered by the BLM.

Plaintiffs seek to enjoin the Plan based on defendants' alleged failure to comply with the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* ("NEPA"), FLPMA, 43 U.S.C. § 1701 *et seq.*, and the resource management planning, programming and budgeting regulations promulgated by the BLM pursuant to Sections 201 and 202 of FLPMA, 43 U.S.C. §§ 1711 and 1712 (the "BLM planning regulations"). 43 C.F.R.

§ 1600 *et seq.*[3] After reviewing the extensive record on these motions, I conclude that plaintiffs have shown that there is a likelihood that they will prevail on the merits at trial. However, equitable considerations militate against granting preliminary injunctive relief in favor of any of the plaintiffs. None of the plaintiffs has shown that the balance of hardships tips in its favor or that it will suffer irreparable harm if preliminary injunctive relief is denied. *See Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980). Accordingly, for the reasons hereinafter stated, each of the motions for preliminary injunctions restraining enforcement and implementation of the Plan will be denied.

## BACKGROUND

### The CDCA Plan

The Plan is a long-range comprehensive plan for the management, use, development and protection of the over 12 million acres of land owned by the United States and administered by the BLM in the CDCA. Section 601 of FLPMA directs the Secretary to prepare and implement a plan which "take[s] into account the principles of mul-

filed a brief in opposition to the motions of plaintiffs in the remaining actions for preliminary injunctions. The term "plaintiffs" will hereinafter refer only to those plaintiffs who have moved for preliminary injunctions. Plaintiff in a fifth action, *California Mining Ass'n v. Watt*, No. CV 80–5602–AWT, had also moved for a preliminary injunction. However, that action was voluntarily dismissed on November 24, 1981. That motion, therefore, is no longer pending.

**2.** It is undisputed that the *status quo ante litem*, at the time these actions were filed, was that the Plan had not yet been adopted. The Court denied plaintiffs' applications for a temporary restraining order, which were heard on December 18, 1980, because the Plan had already been adopted when it was approved by former Assistant Secretary of the Interior Guy Martin on December 17, 1980, pursuant to delegation by the Secretary of his statutory authority. The temporary restraining order hearing, originally set for December 15, was continued to December 18 in reliance on the government's representation to the Court and counsel that the Plan would not be effective until December

19, 1980, when it was to be signed by former Secretary Cecil D. Andrus. Because the lack of timeliness of the hearing on plaintiffs' applications for temporary restraining orders was caused by the government's misrepresentation, even if only inadvertent, of its own intended actions, I conclude, for the purpose of these motions, that it is proper to regard the *status quo* to be as if the applications were timely heard and a temporary restraining order had been issued, *i.e.*, as if the Plan had never gone into effect.

**3.** AMA also alleges that the BLM has failed to comply with Executive Order 12044 and the regulations of the Secretary promulgated thereunder. 43 C.F.R. § 14.1 *et seq.* Since the parties have not adequately briefed the issue of whether there has been an abrogation of the agency's duties under the Executive Order or regulations, this issue is not addressed on these motions. In any event, it appears doubtful that plaintiff has standing to challenge the Plan under the Executive Order and the regulations.

tiple use and sustained yield in providing for resource use and development, including, but not limited to the maintenance of environmental quality, rights-of-way, and mineral development." 43 U.S.C. § 1781(d). The Plan was developed to provide general, regional guidance for management of the CDCA over a 20-year period. BLM, Final Environmental Impact Statement and Proposed Plan VII (1980) ("Final EIS"). It is designed to consider issues and resolve basic conflicts on a large scale in order to aid future decision-makers and "will be at the top of a hierarchy and provide the framework for subsequent plans for specific resources and uses, development of site specific programs or project action." *Id.* at E–2.

The following "planning components" are utilized in the Plan. Broad regional resource uses are addressed by a system of four multiple use classes: Controlled (Class C), which is designed to protect and preserve areas having wilderness characteristics described in the Wilderness Act, 16 U.S.C. § 1131 *et seq.*, and which serves as a preliminary recommendation by the Secretary that the areas are suitable for wilderness designation by Congress; Limited (Class L), which protects sensitive natural scenic, ecological and cultural resources, but provides for low intensity multiple use; Moderate (Class M), designed to provide for a wide variety of use, yet mitigate damage to the most sensitive uses; and Intensive (Class I), which emphasizes development or-iented use of lands and resources to meet consumptive needs, yet provides for some protection of resources. Plan at 13.

All land use actions and resource management activities within a multiple use class must meet the guidelines for that class.[4] The Plan contains a chart which sets out how each of the guidelines will affect uses in each class. *Id.* at 15–20. For example, in accordance with the agricultural guidelines, agricultural uses, excluding livestock grazing, are not allowed in areas designated as Class C or Class L, but may be allowed on suitable lands within Class M and Class I. *Id.* at 15.

A multiple use class may incorporate a number of types and levels of use consistent with the multiple use guidelines. Where such uses conflict, the conflicts—the major issues of the Plan—are addressed in twelve Plan Elements.[5] Each of the Plan Elements is subdivided into three areas of interest and responsibility: goals for the element, actions proposed for the element and implementation of the Plan as it affects the element. In each of the Plan Elements an attempt is made to identify existing or possible conflicts between varying uses and to provide the manager faced with resolution of these conflicts with a framework for making decisions relating to specific land uses.

The Plan (at 125–26) also designates 75 Areas of Critical Environmental Concern ("ACEC"), pursuant to Section 103(a) of FLPMA, which defines an ACEC as an area

---

4. The guidelines are arranged in the Plan (at 14) according to the following list:
 1. Agriculture
 2. Air Quality
 3. Water Quality
 4. Cultural and Paleontological Resources
 5. Native American Values
 6. Electrical Generation Facilities
 7. Transmission Facilities
 8. Communication Sites
 9. Fire Management
 10. Vegetation
 11. Land Tenure Adjustment
 12. Livestock Grazing
 13. Mineral Exploration and Development
 14. Motorized-Vehicle Access/Transportation
 15. Recreation
 16. Waste Disposal
 17. Wildlife Species and Habitat
 18. Wetland/Riparian Areas
 19. Wild Horses and Burros

5. These twelve Plan Elements are:
 Cultural Resources
 Native American Values
 Wildlife
 Vegetation
 Wilderness
 Wild Horses and Burros
 Livestock Grazing
 Recreation
 Motorized-Vehicle Access
 Geology-Energy-Minerals
 Energy Production and Utility Corridors
 Land Tenure Adjustment
 Plan at 21.

"within the public lands where special management attention is required . . . to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems and processes, or to protect life and safety from natural hazards." 43 U.S.C. § 1702(a).

Management prescriptions for each area proposed for ACEC designation have been or will be developed by the BLM. These prescriptions are "site specific" and include both actions which the BLM has authority to carry out and recommendations of action which the BLM has no direct authority to implement, such as cooperative agreements with other agencies and mineral withdrawals. Plan at 123. For example, ACEC # 4, the Saline Valley in Inyo County, has been so designated because it is a wildlife habitat. The management prescriptions developed include cooperative management with the California Department of Fish and Game, acquisition of non-BLM lands through exchange and purchase, reduction of the burro populations, limitation of vehicles to approved routes, designation of camping areas and closing the Saline Dunes to vehicle entry. *Id.* at 125; see also Final EIS, App. IV.

Finally, the Plan identifies "Other Support Requirements," including special soil, air quality, and water resource programs, a trespass prevention program and a cadastral survey of the CDCA. Plan at 137–38.

*The Final Environmental Impact Statement*

The Final EIS, prepared by the BLM as required by NEPA, provides the decisionmaker with four alternatives: a "No-Action Alternative" (as required by the Council on Environmental Quality ("CEQ") regulations which interpret NEPA, 40 C.F.R. § 1500 *et seq.*), a "Protection Alternative," a "Balanced Alternative" and a "Use Alternative." The impact of each alternative on the environment is assessed by investigation of the effect of each plan element on each major resource for each alternative. In this way, the EIS attempts to compare the cumulative impact of each of the alternatives.

Specifically, the environmental impacts on the following resources and activities are evaluated in the EIS: air quality, water quality, soils, energy and minerals, vegetation, wildlife, cultural resources/Native American values, wilderness, visual quality, recreation, domestic livestock grazing, wild horse and burro and socioeconomics. Both the Draft EIS and Final EIS employ the same method of analysis; however, the Final EIS also attempts to assess the impact of additional issues identified in the public review process. See Final EIS at E–5.

The Final EIS serves as both a "programmatic EIS" (the first tier of environmental review applicable to the "major federal action" embodied in the Plan) and a "site-specific EIS." As a "programmatic EIS" it focuses on broad issues and attempts to consider the relationship between the disparate environmental impacts caused by or associated with the various aspects of the Plan. *See National Wildlife Fed'n v. Appalachian Regional Comm'n*, No. 79–2349, slip op at 10 (D.C.Cir. Mar. 19, 1981); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 413, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976). As a "site-specific EIS" it endeavors to assess the environmental impact of the numerous site specific actions accomplished by the Plan (such as the designation of 75 ACECs).

*The Planning Process*

The Plan and Final EIS were in preparation for over three years. The Secretary appointed the CDCA or Desert Advisory Committee ("DAC") in early 1977 as required by Section 601(g) of FLPMA, 43 U.S. § 1781(g). The DAC, which included members of the public with expertise in the various areas critical to the Plan, held numerous meetings and public seminars from 1977 to November, 1980. During that period, a number of techniques were utilized by the BLM to gain public input on the CDCA planning effort, including "feedback meetings" with interested groups, public hearings, three opinion polls and meetings and briefings with federal, state and local government entities. In December 1979, a "Draft Preview" was published to inform

the public of the scope, content and background of the Draft Plan and EIS in preparation for public comment. The Draft Plan and EIS were published and released for public comment in February, 1980. During the comment period further public meetings and briefings were held. A proposed Plan and a Final EIS were published in October, 1980 and circulated for additional public comment. The Plan became effective on December 17, 1980, when former Assistant Secretary Martin approved a marked-up version of the Final Plan. Former Secretary Andrus subsequently concurred in the Plan. Since that time, the BLM has taken steps to implement the Plan within the constraints imposed by time and budgetary limitations. A final version of the Plan was published in April, 1981.

## DISCUSSION

I. *Standard for Issuance of Preliminary Injunctions in Environmental Cases*

■ The Ninth Circuit has declined to specify the standard to be applied in determining whether to grant or deny preliminary injunctive relief in environmental cases. In at least one environmental decision the Court has used the so-called "traditional test," which requires that plaintiff show:

(1) a strong likelihood of success on the merits;

(2) the possibility of irreparable injury to the plaintiff if the preliminary relief is not granted;

(3) a balance of hardships favoring the plaintiff; and

(4) advancement of the public interest.

*See Warm Springs Dam Task Force v. Gribble,* 565 F.2d 549, 551–52 (9th Cir. 1977) (application for stay pending appeal).

However, in other types of cases the Court has held that plaintiffs may satisfy their burden by demonstrating either (1) probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. *Los Angeles Memorial Coliseum Comm'n, supra,* 634 F.2d at 1201; *Benda v. Grand Lodge, IAM,* 584 F.2d 308, 314–15 (9th Cir. 1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 88 (9th Cir. 1975). The plaintiff must make some showing of irreparable harm [6] to satisfy either alternative and at "least a minimal tip in the balance of hardships must be found even when the strongest showing on the merits is made" since "[t]hese are not separate tests, but the outer reaches of a single continuum." *Los Angeles Memorial Coliseum Comm'n, supra,* 634 F.2d at 1201, *quoting Benda, supra,* 584 F.2d at 315.

As stated, the test to be applied in environmental cases remains open in this Circuit. *National Wildlife Fed'n v. Adams,* 629 F.2d 587, 590 n.4 (9th Cir. 1980); *City of Anaheim, Cal. v. Kleppe,* 590 F.2d 285, 288 n.4 (9th Cir. 1978); *Sierra Club v. Hathaway,* 579 F.2d 1162, 1167 n.7 (9th Cir. 1978). However, because neither the so-called "traditional test" nor the alternative test set out in *Inglis* and *Benda* has been met by any of the plaintiffs, it is unnecessary to reach this question. Finally, as suggested by prior cases, I adopt the requirement that in environmental cases a preliminary injunction should not issue, absent a finding that the public interest will be advanced. *See Warm Springs Dam Task Force, supra,* 565 F.2d at 551; *Reserve Mining Co. v. United States,* 498 F.2d 1073, 1076–77 (8th Cir. 1974); *cf., Sierra Club v. Morton,* 405

---

**6.** Plaintiffs claim that in NEPA cases irreparable harm is presumed when the Court finds a "substantial violation" of the statute and contend that traditional equitable principles do not "militate against the capacity of a court of equity as the proper forum in which to make a declared policy of Congress effective." *Lathan v. Volpe,* 455 F.2d 1111, 1116 (9th Cir. 1971) (quoting *United States v. City and County of*

*San Francisco,* 310 U.S. 16, 30–31, 60 S.Ct. 749, 756–57, 84 L.Ed. 1050 (1940)). Therefore, plaintiffs contend, they need not make a showing of irreparable harm. Since plaintiffs lack standing under NEPA and do not seek to effectuate the policies underlying the statute, see Part II(b), *post,* they may not rely on this line of cases and must satisfy the usual criteria justifying equitable relief.

U.S. 727, 740–41 & n.15, 92 S.Ct. 1361, 1368–69 & n.15, 31 L.Ed.2d 636 (1972) (party with standing may assert the interests of the general public in support of its claims for equitable relief). This requirement is particularly appropriate in environmental cases which necessarily involve public rather than private disputes and in which the rights of persons who are not parties to the action are implicated. *See Yakus v. United States,* 321 U.S. 414, 440–41, 64 S.Ct. 660, 674–75, 88 L.Ed. 834 (1944).

## II. *Standing*

■ A threshold question which must be addressed is whether the plaintiff organizations and the County of Inyo have standing to challenge the Plan based on the BLM's purported violation of NEPA, FLPMA, and the BLM planning regulations. A person aggrieved by agency action has standing to challenge that action if:

(1) the challenged action causes him "injury in fact;" and

(2) the alleged injury is to an interest arguably within the zone of interests to be protected or regulated by the statute that the agency is claimed to have violated.

§ 10, Administrative Procedure Act ("APA"), 5 U.S.C. § 702; *Association of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 152–153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); *Port of Astoria, Or. v. Hodel,* 595 F.2d 467, 474 (9th Cir. 1979).

■ An organization has standing to bring an action in a representative capacity on behalf of its members when:

(1) its members would otherwise have standing to sue in their own right;

(2) the interests it seeks to protect are germane to the organization's purpose; and

(3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 2440–41, 53 L.Ed.2d 383 (1977); *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). Finally, a plaintiff who has personally established standing to obtain judicial review of agency action may act as a private attorney general and argue the public interest in support of his claim that the agency has failed to comply with the relevant statutory mandate. *Sierra Club v. Morton, supra,* 405 U.S. at 737–38, 96 S.Ct. at 1367; *Sierra Club v. Adams,* 578 F.2d 389, 393 (D.C.Cir. 1978).

### (a) *"Injury in Fact"*

■ The "injury in fact" component of the APA standing test is mandated by the "case or controversy" requirement of Article III, § 2, of the United States Constitution. The Ninth Circuit has stated that to meet this element of the standing test, "plaintiffs must have alleged (a) a particularized injury (b) concretely and demonstrably resulting from defendant's action (c) which injury will be redressed by the remedy sought." *Port of Astoria, supra,* 595 F.2d at 474; *Bowker v. Morton,* 541 F.2d 1347, 1349 (9th Cir. 1976). Each of the plaintiffs in this action has satisfied the "case or controversy" requirement, in that each has alleged that it or its members will suffer particularized injury from implementation of the Plan and that such injury would be redressed by the injunctive relief it seeks.

AMA alleges that its members utilize portions of the CDCA for recreational motorcycle riding and that as a result of the Plan they will be severely restricted in their customary enjoyment of those areas of the desert which they have been permitted to use under the "Interim Critical Management Program" ("ICMP") (in effect before adoption of the Plan).[7] In addition, AMA

---

7. The ICMP has controlled access and recreation and recreation vehicle use in the CDCA since 1973. ICMP maps will continue to be used by the BLM to govern vehicle access in the CDCA until the changes in designations effected by the Plan can be implemented. See Plan at 89; Depo. of Gerald E. Hillier, BLM

alleges that its ability to organize and sanction competitive race events will be impaired. These uncontradicted allegations, supported by the record, are sufficient to show a "distinct and palpable injury" to AMA and its members, as well as a "fairly traceable causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978). Such injuries to recreational values are sufficient to satisfy the Article III "injury in fact" requirement. *Sierra Club v. Morton, supra*, 405 U.S. at 738, 96 S.Ct. at 1367; *see Association of Data Processing Serv. Organizations, supra*, 397 U.S. at 154, 90 S.Ct. at 830. Furthermore, AMA has standing to represent its members since its claims under NEPA and FLPMA and the relief it requests do not require the participation of each of the individual members of the organization and since the interests it seeks to protect are germane to its purpose: organizing, financing and sanctioning recreational and competitive motorized vehicle events. *See Washington Apple Advertising Comm'n, supra*, 432 U.S. at 342–43, 97 S.Ct. at 2440–41.[8]

Plaintiff NOC alleges that its members also use the CDCA for recreational purposes, including off-road vehicle use, mineral exploration, archaelogical investigation, camping and hunting, and that these recreational opportunities have been diminished by the planning decisions activated with the Plan's adoption. Like AMA, NOC has presented adequate evidence of loss of recreational opportunities by its members to satisfy the Article III "injury in fact" requirement of the test for standing. *Sierra Club v. Morton, supra*, 405 U.S. at 738, 96 S.Ct. at 1367; *see Association of Data Processing Serv. Organizations, supra*, 397 U.S. at 154, 90 S.Ct. at 830. Moreover, NOC, for the same reasons applicable to AMA, satisfies the requisites for representative standing set out in *Washington Apple Advertising Comm'n*.

Nearly one-half of Inyo County is within the CDCA. The citizens and taxpayers of Inyo County are extensive users of CDCA lands both for business and recreational purposes. Inyo has a statutory duty to adopt a comprehensive general plan, Cal. Gov't Code §§ 65300–03, and its ability to do so has been significantly prejudiced by the Plan. Inyo has also shown that its tax base will be impaired because the County's economy is dependent upon visitors seeking recreation within the CDCA and upon mining revenues.

■ The County, in effect, asserts its standing to bring an action challenging the Plan on three theories: (1) it seeks to represent the interests of its citizens and taxpayers; (2) it claims that it has been harmed by the loss of County revenues caused by the Plan; and (3) it claims that the Plan has diminished its state-mandated planning ability. Inyo's first theory is insufficient to establish that the County has suffered "injury in fact." Inyo County is a "political division of the State." Cal.Gov't Code § 23000. In this Circuit, "political subdivisions, such as cities and counties, whose power is derivative and not sovereign, cannot sue as *parens patriae* to protect the interests of their citizens and taxpayers." *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973), *cert. denied sub nom., Morgan v. Automobile Mfrs. Ass'n, Inc.*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

■ Political subdivisions may, however, "sue to vindicate such of their own proprietary interests as might be congruent with the interests of their inhabitants." *Id.* Although impairment of the County's tax base will result in harm to the County as an entity, this harm will merely be derivative of the Plan's impact on taxpayers; therefore, it should not be considered harm to

District Manager, Cal. Desert District at 102–11 (Jan. 26, 1981).

**8.** It is not necessary to decide whether AMA has established "injury in fact" in its own right since, as a representative, it shares the interests of its members in organizing and sanctioning competitive events.

the County's "proprietary interests." *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 672–73 (D.C.Cir.1976), *cert. denied sub nom. Pennsylvania v. Kobelinski*, 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976); *Puerto Rico v. Alfred L. Snapp & Son, Inc.*, 469 F.Supp. 928, 930–31 (W.D.Va.1979); *cf., City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979), *cert. denied sub nom., Rohnert Park v. Landrieu*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980) (treating loss of tax revenues as *parens patriae* interest, and finding no proprietary interest to justify standing); *contra Alabama v. T. V. A.*, 467 F.Supp. 791, 794 (D.Ala.1979); *see Louisiana v. D. O. E.*, 507 F.Supp. 1365, 1370 (D.La.1981). On the other hand, the harm caused by disruption of local comprehensive planning falls directly on the County, and may be fairly characterized as harm to the County in a proprietary sense. *Cf., City of Davis v. Colemen*, 521 F.2d 661, 671 (9th Cir. 1975) (where agency action might adversely affect city water supply, and would frustrate city's policy of controlled growth, injury in fact test is satisfied). Here, Inyo has shown that its ability to develop and adopt a general plan (as required by Cal.Gov't Code §§ 65300–03) has been significantly impaired. This is sufficient to show injury to Inyo's interests as a political entity, thereby satisfying the Article III "case or controversy" requirement. Accordingly, I conclude that County of Inyo has met the Article III "injury in fact" requirement, but only with respect to harm to its planning activities.

(b) *"Zone of Interests"*

Apart from Article III jurisdictional questions, the Supreme Court has developed a "rule of self-restraint" limiting standing to seek judicial review of agency action. *Association of Data Processing Serv. Organizations, supra*, 397 U.S. at 154, 90 S.Ct. at 830. In applying this rule to cases where a plaintiff challenges agency action as violative of a statute, the Court has required that the challenger be within the "zone of interests" contemplated by that statute. *Id.; Port of Astoria, supra*, 595 F.2d at 474.

There is no doubt that plaintiffs AMA and NOC fall within the "zone of interests" protected by the applicable provisions of FLPMA. Section 601(d), 43 U.S.C. § 1781(d), directs the Secretary to "prepare and implement a comprehensive, long-range plan for the management, use, development, and protection of the public lands within the California Desert Conservation Area." The Congressional findings recognize that provisions should be made for "present and future use and enjoyment [of California Desert resources], particularly outdoor recreation uses, including the use, where appropriate, of off-road recreational vehicles." 43 U.S.C. § 1781(a)(4). Section 601(d) further directs the Secretary to "take into account the principles of multiple use and sustained yield in providing for resource use and the development, including but not limited to maintenance of environmental quality, rights-of-way, and mineral development." 43 U.S.C. § 1781(d).

County of Inyo also falls within FLPMA's zone of interests. Section 601(d) requires that the Secretary prepare the CDCA plan in accordance with 43 U.S.C. § 1712, which governs the development, maintenance and revision by the Secretary of all land use plans for public lands. Section 1712(c)(9), in turn, requires the Secretary to "provide for meaningful public involvement of state and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands" and contains the mandate that "[l]and use plans of the Secretary under this section shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of" FLPMA.

■ However, none of the plaintiffs fall within the "zone of interests" contemplated by NEPA. The interests to be protected by NEPA may be gleaned from the Congressional declaration of purpose:

"To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and

welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation. . . ."

42 U.S.C. § 4321. In order to fall within NEPA's "zone of interests" a plaintiff must allege some "environmental harm" which will result from agency action. *Port of Astoria, supra,* 595 F.2d at 475; *Realty Income Trust v. Eckerd,* 564 F.2d 447, 452 (D.C.Cir.1977); *Churchill Truck Lines, Inc. v. United States,* 533 F.2d 411, 416 (8th Cir. 1976); *Hiatt Grain & Feed, Inc. v. Bergland,* 446 F.Supp. 457, 487 (D.Kan.1978), *aff'd,* 602 F.2d 929 (10th Cir. 1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980); *see also Gifford-Hill & Co. v. F. T. C.,* 523 F.2d 730, 732 (D.C.Cir. 1975) (NEPA's concern is with protection of the environment, not with the desire of parties to prevent or delay administrative efforts to enforce the antitrust laws).

The courts have held that plaintiffs whose "real" or "obvious" interest is not environmental, but who assert cognizable injury to the environment, have standing under NEPA. *See, e.g., Realty Income Trust, supra,* 564 F.2d at 452 (erection of new office building alleged to cause loss of rental income and injury to the environment due to impact on vehicular and pedestrian traffic); *National Helium Corp. v. Morton,* 455 F.2d 650, 655 (10th Cir. 1971) (helium extractor claimed that Secretary of the Interior's cancellation of a helium conservation contract would result in economic harm to it and depletion of the nation's supply of helium); *Mobil Oil Corp. v. F. T. C.,* 430 F.Supp. 855, 862–63 (S.D.N.Y.) *rev'd on other grounds,* 562 F.2d 170 (2d Cir. 1977) (oil companies alleged that relief requested by F. T. C. in enforcement proceeding would result in unnecessary depletion of the nation's natural resources and that plaintiffs who were dependent on these resources would suffer economic injury).

Here, however, none of the plaintiffs alleges any environmental injury to itself,

its members, the public or the desert as a result of the Plan. They assert only that the Plan will restrict their *use* of the CDCA. Accordingly, on the basis of the "injury in fact" which they allege, plaintiffs do not fall within the "zone of interests" contemplated by NEPA; consequently, they cannot challenge the adequacy of the Final EIS under NEPA. NEPA's requirement that an EIS be prepared for every "major Federal action significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), is designed to insure that the agency has taken a "hard look" at the environmental consequences of its action, *Kleppe v. Sierra Club, supra,* 427 U.S. at 410 n.21, 96 S.Ct. at 2730 n.21, and to allow other officials, Congress and the public to independently evaluate the environmental consequences of the action. *Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585, 592 (9th Cir. 1981). To allow plaintiffs who fail to allege or prove any environmental harm (and, thus, fail to make any showing that the Final EIS has not served its intended purpose) to challenge an EIS would subvert the Congressional intent behind NEPA.[9]

### III. *The BLM's Procedural Violations*

Plaintiffs allege numerous violations by defendants of FLPMA, NEPA and the BLM planning regulations, which they claim invalidate the Plan. Since I have concluded that none of the plaintiffs has standing to challenge the Final EIS, it is unnecessary to determine whether defendants violated NEPA or failed to follow any of the CEQ interpretive regulations. Therefore, we examine only the asserted violations of FLPMA and the BLM planning regulations.

### (a) *Procedures Required by FLPMA and the BLM Planning Regulations*

■ FLPMA requires that the Plan be prepared "in accordance with section 1712

---

**9.** Because I base my finding of plaintiffs' probability of success on the merits on violations of FLPMA and the BLM planning regulations, (see Part III, *post*), I reserve decision on whether 43 C.F.R. § 1601.5, which provides that the environmental analysis requirements of NEPA be included in the BLM resource management planning process, confers standing to challenge a defective EIS on a plaintiff who cannot otherwise establish standing under NEPA.

of this title." 43 U.S.C. § 1781(d). Section 1712 applies to all public lands, 43 U.S.C. § 1712(a), and requires that:

"The Secretary shall allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands."

43 U.S.C. § 1712(f).

The BLM planning regulations were published on August 7, 1979. 44 Fed.Reg. 46,-392 (1979). These regulations were promulgated pursuant to the authority delegated in FLPMA, 43 U.S.C. §§ 1711 & 1712, and several other statutes.[10] They became effective on September 6, 1979.

■ I conclude that the BLM planning regulations were applicable to the CDCA planning process and that the BLM was bound to adhere to the procedures established by its own regulations. Defendants' argument that these regulations do not apply to the CDCA or to the Plan (see Decl. of James B. Ruch, Cal. State Director of BLM, at 15 (Feb. 4, 1981); Depo. of Ruch at 15–18; 34–56; 82–87 (Feb. 26, 1981))[11] is unpersuasive. First, there is no official interpretive or policy statement of the agency supporting this interpretation; it is asserted only in the declaration and deposition of a subordinate agency official. Second, although a federal agency's interpretation of

a statute or regulation is entitled to great deference by reviewing courts, *e.g., Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *Columbia Basin Land Protection Ass'n, supra,* 643 F.2d at 599–600, this rule applies only if the agency interpretation is reasonable and not clearly outside the agency's statutory authority. *Id.* Here, even assuming that Ruch's testimony should be accorded the dignity of official agency interpretation, his interpretation is unreasonable since the statute, 43 U.S.C. § 1781(d), clearly requires the Secretary to comply with Section 1712 in the preparation and implementation of the Plan. In turn, Section 1712(f) delegates to the Secretary the authority to establish procedures to give federal, state and local governments and the public adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of public lands. Finally, the language of the regulations promulgated under the Secretary's § 1712(f) authority itself suggests that the regulations are applicable to the Plan. 43 C.F.R. § 1601.0–7 states: "[t]hese regulations apply to all BLM administered public lands." "Public lands" is defined as "any land or interest in land owned by the United States and administered by the Secretary of the Interior through the Bureau of Land Management." 43 C.F.R. § 1601.0–5(j). In short, defendants' claim that the BLM planning regulations were not meant to apply to the CDCA planning process because the

---

**10.** The following statutes are also cited as authority for issuance of these regulations: § 3 of the Federal Coal Leasing Amendments Act of 1976, 30 U.S.C. § 201(a); §§ 522, 601 & 714 of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1272, 1281 & 1304; and NEPA.

**11.** Defendant Ruch claims that these regulations are not applicable to the CDCA planning process because:

(1) The CDCA incorporates more than one BLM district within its boundaries and was developed by a special Desert Planning Staff headed by a Desert Planning Staff Director answerable to the California State Director of the BLM, rather than to a Dis-

trict Manager. (The regulations refer to the duties of the "District Manager.") Decl. of Ruch at 15 (Feb. 18, 1981).

(2) The regulations were intended to be implemented in a "phased process" and at the time they were issued the agency was already several years down the road on the Plan. Depo. of Ruch at 15–16, 50–51 (Feb. 26, 1981).

(3) The Plan involved "different circumstance[s]" than a normal land use plan and the BLM couldn't comply with the regulations without changing the Plan back into a series of small resource plans, rather than one large comprehensive land use plan. *Id.* at 47–48, 51–52.

Plan was somehow different from the usual land use plan is plainly unreasonable because this interpretation is in conflict with the statute, 43 U.S.C. §§ 1781(d) & 1712(f), and the language of the regulations themselves.

■ Moreover, the BLM planning regulations appear to be "legislative" rather than "interpretive rules." "Legislative rules" are the product of legislative power to make law through rules which is delegated by Congress to an administrative agency. *Batterton v. Francis*, 432 U.S. 416, 425 n.9, 97 S.Ct. 2399, 2405 n.9, 53 L.Ed.2d 448 (1977); 2 K. Davis, *Administrative Law Treatise* § 7:8 (2d ed. 1979); *see General Electric v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976). As such, they are binding on the agency which issues them. *United States v. Nixon*, 418 U.S. 683, 695–96, 94 S.Ct. 3090, 3100–01, 41 L.Ed.2d 1039 (1974); *Ruangswang v. INS*, 591 F.2d 39, 46 n.12 (9th Cir. 1978); Davis, *supra*, at § 7:21. Since the regulations became effective well before the Draft Plan and EIS were published in February, 1980, and because I conclude that they are legislative regulations, they were binding on the agency for these reasons as well.[12]

(b) *Violations of FLPMA and the BLM Planning Regulations*

■ I find on the record as a whole that there is a strong likelihood that plaintiffs will be able to prove at trial that, in several material respects, the BLM failed to follow its own planning regulations and that such failure resulted in the agency's violation of § 202(c)(9) & (f) of FLPMA. 43 U.S.C. § 1712(c)(9) & (f).

43 C.F.R. § 1601.5–7 requires that in preparing the Plan, the BLM evaluate the alternative courses of action developed in the planning process (and their effects according to planning criteria) and "develop a

preferred alternative ... [which] shall be incorporated into the draft plan and draft environmental impact statement." No "preferred alternative" was designated in the Draft Plan and EIS published in February, 1980. This omission deprived state and local agencies and the public of the opportunity to focus their comments on the alternative which the agency was likely to recommend to the Secretary, at the draft stage before a final BLM decision had been made.

43 C.F.R. § 1601.3(i) requires that "ninety days ... be provided for review of the draft plan, and draft environmental impact statement." Although defendants claim that the full 90 days were available, several of the appendices which were an integral part of the Plan were not available until well into the review period. By failing to make the appendices available at the outset, defendants made it impossible for state and local governments, the public, and special interest groups, such as AMA and NOC, to review and comment upon all of the changes which the Plan would effect and the data upon which these actions were based. *Cf. Columbia Basin Land Protection Ass'n, supra*, 643 F.2d at 595 (information necessary to allow public to respond and to know basis of agency's ultimate conclusion must be available under NEPA disclosure requirements).

The BLM's failure to follow its own planning regulations by not designating a preferred alternative at the draft stage and by not allowing the full 90 days to review all of the integral draft plan documents prejudiced plaintiffs' ability to comment upon and participate in the formulation of the Plan as required by FLPMA, 43 U.S.C. § 1712(f).

Plaintiff Inyo County also claims that the BLM has violated § 202(c)(9) of FLPMA, 43 U.S.C. § 1712(c)(9), and 43 C.F.R. § 1601.4, which provide for the coordination of BLM

12. Although an agency is empowered to make "legislative" rules, a rule may still be interpretive if the agency so intends. A reviewing court must do its best to discover the agency's intent. Davis, *supra*, at § 7:8. No credible or persuasive evidence indicates that the BLM

planning regulations were not intended to have the force of law. Therefore, I conclude that the BLM planning regulations, although they are procedural rather than substantive, are "legislative" rules.

resource management plans with the management plans of state and local governments. BLM State Directors and District Managers are required to keep apprised of state and local plans, to assure that consideration is given to them and to assist in resolving inconsistencies between BLM plans and such plans to the extent practical. Defendants claim to have taken state and local land use plans into account in developing the Plan and to have resolved inconsistencies to the extent required by § 1601.4. (See Aff. of Neil F. Pfulb at 6–7 (Dec. 17, 1981); Depo. of Ruch at 375–384 (Mar. 2, 1981).) However, the failure of defendants to comply with 43 C.F.R. § 1601.4–2(c) & (d) makes it impossible for the Court to determine whether the BLM has complied with the mandate of 43 C.F.R. § 1601.4 and 43 U.S.C. § 1712(c)(9). Subsections 2(c) and (d) allow state and local agencies to notify the BLM of specific inconsistencies between their plans and BLM resource management plans and require that the plan document reflect how these inconsistencies were addressed and, if possible, resolved. Since this procedure was not followed in that defendants have not presented adequate evidence of their response to Inyo County's list of inconsistencies (see Ex. "A" & "B" to Complaint of Inyo County), I conclude that it is likely that Inyo County will be able to prove violations of 43 U.S.C. § 1712(c)(9) and 43 C.F.R. § 1601.4 at trial.

Finally, plaintiffs point out that the Decision Document (signed into law by former Assistant Secretary Martin on December 17, 1980) contained a number of material changes from the Final Plan and EIS which was circulated for comment, which changes were never subjected to the scrutiny of the DAC or published for examination and comment by state and local governments and the general public.[13] The failure of the BLM to allow any public and governmental participation relative to these changes, which amount to significant actions in their own right, appears to amount to a further violation of 43 U.S.C. §§ 1712(c)(9) & (f) and 1781(d), and the BLM planning regulations.[14]

Plaintiffs have adequately demonstrated that they have standing to prosecute these actions and that they are likely to succeed on the merits at trial.

## IV. Equitable Considerations

It is not enough that plaintiffs have demonstrated likelihood of success on the merits; they must also demonstrate that the equities of the case require injunctive relief before trial, i.e., that they will suffer irreparable harm absent issuance of a preliminary injunction, that the balance of hardships tips in their favor and, since this is an environmental case where the public interest is implicated, that preliminary injunc-

13. Such changes include:
(1) Designation of all Class "L" lands as "sensitive areas" of public concern requiring, without prior determination by a BLM officer, a 60-day comment period, prior to approval of any application for a plan of operations. See Memo. from Hillier, Ex. 3002 to Depo. of Ruch (Mar. 1, 1981).
(2) The designation of a portion of the CDCA as the "East Mojave National Scenic Area." See Defendant's Memorandum in Rebuttal, filed Feb. 12, 1981, p. 6a; Depo. of Hillier at 132–33.
(3) The inclusion of three race routes which had never been developed as part of any of the plan alternatives up to that point. See Partial Transcript of DAC Meeting, Jan. 16, 1981, pp. A–237–39 of Appendix to Joint Supplemental Memorandum of Points and Authorities of Plaintiffs County of Inyo and AMA in Support of Application for Prelimi-

nary Injunction ["Appendix"]; Depo. of Hillier at 81–84; Depo. of Ruch at 99–113.
(4) Increasing the ACEC's from 73 to 75 and the areas preliminarily recommended as suitable for wilderness designation from 43 to 45. Defendant's Memorandum in Rebuttal, filed Feb. 12, 1981, at p. 6a; see also, Decl. of Gerald Budlong, pp. A–19–27 of Appendix.

14. It is unnecessary to decide on these motions whether alleged defects in the Mineral and Wildlife elements of the Plan and the BLM's modification of the amendment process contained in the Draft Plan and EIS resulted in further violations of FLPMA and the BLM regulations. The question of whether the Final EIS contained a discussion of alternatives sufficient to comply with 43 C.F.R. § 1601.5–5 is also left to another day.

tive relief would benefit the public in general.[15]

On the record before the Court, I find that none of the plaintiffs has made a sufficient showing of the equitable elements to justify the issuance of a preliminary injunction restraining the implementation of the Plan pending trial. In making this determination and in weighing the public interest, I am mindful of Congress' concern that the CDCA is "seriously threatened by air pollution, inadequate Federal management authority, and pressures of increased use, particularly recreational use, which are certain to intensify because of the rapidly growing population of southern California." 43 U.S.C. § 1781(a)(3). Accordingly, I conclude that the public interest in maintaining the Plan and in protecting the CDCA outweighs any possible harm to plaintiffs.

The only real showing of irreparable harm by plaintiffs NOC and AMA is that their members will be deprived of some recreational opportunities until trial. This deprivation is attributable to the reduction in the amount of vehicle use allowed under the Plan from that permitted under the ICMP, which governed vehicle access prior to the time that the Plan went into effect. AMA also claims that it will suffer irreparable injury because the Plan precludes holding competitive events outside of the three race routes established in the Plan. Neither NOC nor AMA have submitted any evidence that their members will be completely deprived of recreational opportunities under the Recreational and Motorized Vehicle Elements of the Plan. See Plan at 82–94 & Motorized Vehicle Access Map No. 10. The evidence shows only that such opportunities will be restricted. Further, AMA has not shown that it will be totally unable to sanction competitive events. On the other hand, I find that there is a danger of harm to the CDCA from the types of activities which these plaintiffs intend to pursue and that the restrictions on access imposed by the Plan will serve to protect fragile desert resources from the pressures of increased motorized vehicle use. Plain-

tiffs AMA and NOC have failed to prove either that their inconvenience pending trial outweighs the threat of harm to the desert from more intensive recreational use or that it would be in the public interest to enjoin the operation of the Plan as it impacts their interests.

County of Inyo has presented a somewhat stronger case that it will suffer irreparable harm if the Plan is not preliminarily enjoined, in that its general planning duties have been hampered by the Plan, which imposes a number of restrictions in conflict with Inyo's Master Plan for adjacent private lands. Like the other plaintiffs, however, I find that the harm which Inyo will suffer as a result of the Plan's disruption of its planning activities is not sufficient to outweigh the harm to the CDCA and the public interest if implementation of the Plan is enjoined. It should also be noted that while the County's planning efforts may be impaired by uncertainty regarding the legal validity of the Plan, issuance of a preliminary injunction would do little to redress that injury, since the Plan's validity will remain uncertain until judgment has been entered on the merits in this action.

## CONCLUSION

For the foregoing reasons, each of the motions of plaintiffs for a preliminary injunction restraining the implementation and enforcement of the California Desert Conservation Area Plan by defendants is hereby denied. This memorandum opinion shall serve as the Court's findings of fact and conclusions of law pursuant to Fed.R. Civ.P. 52(a).

---

**15.** *See* Part I, *ante.*